**Vivian MATTISON; Morty Ronald Mattison, Plaintiffs–Appellees,**

v.

**DALLAS CARRIER CORPORATION, Defendant–Appellant.**

**No. 91–3008.**

United States Court of Appeals, Fourth Circuit.

Argued June 5, 1991.

Decided Oct. 11, 1991.

As Amended Oct. 28 and Nov. 21, 1991.

George Kermit Lyall, Nelson, Mullins, Riley & Scarborough, Greenville, S.C., argued (Edwin L. Turnage, on brief), for defendant-appellant.

William Jeffry Weston, Code & Weston, P.A., Greenville, S.C., argued (Merl F. Code, on brief), for plaintiffs-appellees.

Before ERVIN, Chief Judge, NIEMEYER, Circuit Judge, and ELLIS, District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

NIEMEYER, Circuit Judge:

Although punitive damages have been awarded in the United States in diverse circumstances for approximately two hundred years, only recently have they been awarded in such amount and with such frequency that the activity has awakened a constitutional conscience about them. In this case we hold that the South Carolina law for awarding punitive damages, applied by the district court whose jurisdiction was based on diversity of citizenship, denied the defendant due process in violation of the Fifth Amendment, because its lack of meaningful standards allowed the jury to exercise unconstrained discretion in making its awards. We reject the defendant's remaining assignments of error in this case. Accordingly, we affirm the award of compensatory damages, and with respect to punitive damages we reverse and remand for a new trial.

I

Morty Mattison and his wife, Vivian, were driving home in a downpour during the late afternoon of August 30, 1989, when they collided with the rear of an eighteen-wheel tractor trailer parked in the right-hand lane of South Carolina Secondary Road 107 in Greenville, South Carolina. Secondary Road 107 consists of four lanes divided by a median "emergency lane." Although the Mattisons were travelling slowly, at approximately 20 miles per hour, they were unable to see the parked tractor trailer in time to stop, even though the tractor trailer had its flashers operating, because the rain "virtually obscured visibility." The driver of the tractor trailer, who was returning to his office only a mile away, had stopped in the right travel lane to make a phone call to his dispatcher. As the result of the collision, Mr. Mattison sustained a broken arm, a broken finger, and an aggravation of his preexisting hip condition. Mrs. Mattison sustained pain and stiffness in her back and neck, numbness in her face, and problems with shortness of breath.

Relying on federal jurisdiction based on diversity of citizenship, the Mattisons sued Dallas Carrier Corporation, the owner of the tractor trailer, in federal court, alleging negligence, gross negligence, and recklessness in the operation of the tractor trailer by its driver. A jury awarded Mr. Mattison $100,000 in compensatory damages and Mrs. Mattison $25,000. It also awarded each of them $50,000 in punitive damages, for a total of $100,000. The net worth of Dallas Carrier Corporation at the time of the award was $6,428. The district court denied post-trial motions for judgment notwithstanding the verdict, a new trial, and remittitur.

On appeal, Dallas Carrier Corporation contends that the law of South Carolina for awarding punitive damages violates the due process and equal protection clauses of the United States Constitution and the South Carolina Constitution. It also contends that (1) the district court erred in permitting a lay witness to give an opinion about the adequacy of emergency flashers, (2) the district court improperly instructed the jury, and (3) the evidence was insufficient to support the verdict.

II

The question of whether South Carolina punitive damages law denies the defendant due process becomes particularly entangled

by the grounds of decision given by the Supreme Court in *Pacific Mut. Life Ins. Co. v. Haslip,* —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), for upholding the Alabama punitive damages scheme against an alleged due process violation. In evaluating the Alabama scheme, where instructions to the jury were not significantly different from the schemes previously questioned by members of the Court for their lack of standards, *see id.* 111 S.Ct. at 1045 n. 10 (cases cited therein), the Supreme Court turned its attention to the post-verdict process, passing lightly over the pre-verdict process which gave rise to the verdict in the first place. The Supreme Court held that post-trial reviews of awards that are required by Alabama law, in which the trial court and the appellate court apply independent substantive criteria of review, even to the extent of considering evidence that was not before the jury, provide adequate constraints to satisfy due process.

■ This unusual approach of emphasizing post-verdict review to the extent of perhaps slighting a review of the pre-verdict process, *cf. Giaccio v. Pennsylvania,* 382 U.S. 399, 403–04, 86 S.Ct. 518, 521–22, 15 L.Ed.2d 447 (1966), raises significant questions when federal courts, sitting in diversity cases, are confronted with the proper application of state punitive damages. The legitimizing constraints provided by the quasi *de novo* review process practiced under Alabama state law cannot be applied by a federal district court. While a district court must apply the substantive law of the state when instructing the jury on punitive damages, *see Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), it must also apply the Federal Rules of Civil Procedure and, therefore, must review the jury verdict un-

der standards established by Rules 50(b) (directed verdict and j.n.o.v.) and 59 (new trial). Moreover, the review by a federal district court of a jury verdict is always subject to the Seventh Amendment constraints guaranteeing the right to a jury trial which are not imposed on any state-prescribed post-trial review.[1] This division in the application of substantive state law and federal procedural law is specifically confirmed in *Browning–Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 279, 109 S.Ct. 2909, 2922, 106 L.Ed.2d 219 (1989):

> In reviewing an award of punitive damages, the role of the District Court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered. The Court of Appeals should then review the District Court's determination under an abuse-of-discretion standard.

*See also Defender Indus., Inc. v. Northwestern Mut. Life Ins. Co.,* 938 F.2d 502, 504–05 (4th Cir.1991) (en banc).

Because the reviews under Rules 50(b) and 59 are more deferential to jury verdicts than appears to be the process under the state law of Alabama and because the Seventh Amendment does not permit a federal court to substitute its judgment for that of a jury, as long as the jury operates within the constraints of the law and the evidence, the guidance provided by the holding in *Haslip* is of limited assistance. The *Haslip* methodology of analyzing both pre-verdict and post-verdict processes, however, instructs us to consider a hybrid scheme consisting of the substantive law of South Carolina for giving the jury its law on punitive damages and the post-trial review which applies federal standards.

---

1. U.S. Const. amend. VII provides:
 In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.

The Seventh Amendment is not binding on the states. *See, e.g., Hardware Dealer Mut. Fire Ins. Co. v. Glidden Co.,* 284 U.S. 151, 158, 52 S.Ct. 69, 71, 76 L.Ed. 214 (1931); *Pearson v. Yewdall,* 95 U.S. 294, 296, 24 L.Ed. 436 (1877).

### III

■ The law of South Carolina permits a jury to award punitive damages to punish, deter, and vindicate the rights of the plaintiff whenever the conduct of the defendant is willful, wanton or reckless. *Rogers v. Florence Printing Co.*, 233 S.C. 567, 106 S.E.2d 258, 261, 263 (1958). The plaintiff must prove by clear and convincing evidence that the conduct included a "consciousness of wrongdoing" at the time of the conduct. *Rogers*, 106 S.E.2d at 263; S.C.Code Ann. § 15–33–135 (Law. Co-op. Supp.1990) (punitive damages burden of proof). Punitive damages may be awarded only if actual damages are awarded. *See Carroway v. Johnson*, 245 S.C. 200, 139 S.E.2d 908, 910 (1965).

■ The amount of penalty is committed to the discretion of the jury. The Supreme Court of South Carolina has repeatedly announced that no formula applies in awarding punitive damages and their award and amount are "peculiarly within the judgment and discretion of the jury, subject to the supervisory power of the trial judge over jury verdicts." *See, e.g., Hicks v. Herring*, 246 S.C. 429, 144 S.E.2d 151, 154 (1965). Thus, in *Rogers* the court stated that there is no appropriate ratio between actual damages and punitive damages: "There would appear to be no sound reason for a rule requiring the one to be in definite ratio to the other; no such rule exists in this state." 106 S.E.2d at 262. Similarly, there is no requirement that punitive damages bear any specified relationship to the wealth of the defendant. While the court decisions state that the financial ability of the defendant is a relevant factor for consideration by the jury, it is apparently not limiting, and there is no requirement that the defendant have a means to pay. *See Norton v. Ewaskio*, 241 S.C. 557, 129 S.E.2d 517, 521 (1963) (punitive damages award upheld against a monk "whose wealth [was] known to be nonexistent"). Moreover, punitive damages awards would apparently be upheld in the absence of any evidence of the worth of the defendant. *See Rogers*, 106 S.E.2d at 263 (punitive damages question is best left to the jury to "arrive at a fair award of such damages whether or not evidence be offered as to the defendant's financial worth").

■ The only constraint on the award by the jury is provided by the discretion given to the trial court to review the award for excessiveness. *Hicks*, 144 S.E.2d at 154. The review by the appellate court is under an abuse-of-discretion standard. The appellate court will reverse a trial court's refusal to set aside an award only when the award is " 'so shockingly excessive as manifestly to show' that the jury was actuated by caprice, passion or prejudice." *Id.* (citation omitted).[2]

■ When the verdict is returned in a federal court and is subject to federal standards of review under Rules 50(b) and 59, no significantly greater restraint is provided. The verdict is permitted to stand unless, under Rule 50(b), no substantial evidence is presented to support the award, *Defender Indus.*, 938 F.2d at 505, or, under Rule 59, the verdict is "against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice." *Id.* at 507 (*quoting Aetna Casualty & Sur. Co. v. Yeatts*, 122 F.2d 350, 352 (4th Cir.1941)).

In this case the district court instructed the jury substantially in compliance with the law of South Carolina. After pointing out when punitive damages are available, their purpose, and the standard of proof required, the court turned its attention to the method by which the jury must quantify them. On that subject, the instructions stated in full:

> The amount of punitive damages assessed against any defendant may be such sum as you believe will serve to punish that defendant and deter it and others from like conduct.
>
> \* \* \* \* \* \*

---

2. After this case was argued, the Supreme Court of South Carolina modified its standards for reviewing a punitive damages award in *Gamble v. Stevenson*, 406 S.E.2d 350 (1991). We discuss the implications of this decision below.

Now there was a statement—you must also take into consideration a defendant's ability to pay. I permitted a statement to be read while ago and it was not intentional, it was the statement of the assets. I believe it was read in the record, there were $8,000,000. That was total assets. The net assets in the case, or the net worth and I think the statement was introduced, if not we will introduce it. It reflects that the net worth is somewhere in the neighborhood of a little over a half-million dollars, I believe.

Keep in mind that you should not award, cannot award punitive damages without first awarding actual damages. No other criterion was given or limitation imposed on the amount, and, as permitted by South Carolina law, the jury was thus left with the discretion to enter an amount of punitive damages as it considered appropriate to punish and deter.

The jury awarded punitive damages of $100,000, which is about 15 times in excess of Dallas Carrier's actual net worth of $6,428. Dallas Carrier's post-trial motions to set aside the verdict, for new trial or for remittitur were all denied, presumably under standards of review supplied by the federal rules, although the record does not reveal the reasons for the district court's denial of the motions. While Dallas Carrier argues that the verdict reveals caprice and passion because of the total absence of any proportionality, it has not contended that the verdict in fact sounds the death knell of the corporation. It has, however, consistently and steadfastly urged that the scheme for awarding punitive damages is unconstitutional.

## IV

In contending that due process has not been provided, Dallas Carrier argues that the standard for awarding punitive damages in South Carolina is vague and there-fore arbitrary, and that despite its penal characteristics, punitive damages are assessed without procedural safeguards of a type approximating those granted in criminal proceedings. Because South Carolina permits an award of punitive damages for conduct characterized as reckless, willful or wanton, which Dallas Carrier contends is often no more than a heightened degree of negligence, punishment is permitted "without culpability." It argues that the illegal behavior is not adequately defined.

When turning to the method by which the amount of punitive damages are calculated under South Carolina law, Dallas Carrier argues that "there is a complete lack of intelligible standards for assessing them." It notes that South Carolina law is "alarmingly similar" to that of Vermont and Mississippi which the Supreme Court implied lack adequate standards. See Haslip, 111 S.Ct. at 1045 n. 10. Finally, Dallas Carrier notes that South Carolina offers no meaningful review of punitive damages awards, either by the trial court or an appellate court. It concludes that South Carolina juries have "unfettered discretion to fashion a punitive damages award and such awards must generally be upheld [by South Carolina appellate courts]." [3]

In part, we agree with Dallas Carrier's argument.

The first principle of due process embraces a rule of law which contains standards that can be known in advance, conformed to, and applied rationally. The doctrine of the supremacy of law is "a doctrine that the sovereign and all its agencies are bound to act upon principles, not according to arbitrary will; are obliged to follow reason instead of being free to follow caprice." R. Pound, The Spirit of the Common Law 183 (Beacon Press ed. 1963). Oliver Wendell Holmes, Jr. also touched on this notion

---

**3.** Dallas Carrier has also raised an equal protection challenge to the punitive damages awards, on the basis that the South Carolina scheme "preys" on the prejudices of the jury by discriminating against the wealthy, since there are no limiting standards, and against out-of-state corporate defendants. Finally, Dallas Carrier relies on the due process and equal protection clauses of the South Carolina Constitution. Because we hold that the South Carolina scheme applied by a federal court violates the due process clause of the U.S. Constitution, amend. V, we do not reach these other contentions.

in his classic *The Common Law* (M.D. Howe ed. 1963).

> [A]ny legal standard must, in theory, be capable of being known. When a man has to pay damages, he is supposed to have broken the law, and he is further supposed to have known what the law was.

*Id.* at 89.[4]

The constitutional basis for invalidating, as a violation of due process, the delegation without standards of discretion to the jury has been specifically and repeatedly articulated by the Supreme Court. *See* Note, *Constitutional Defenses Against Punitive Damages: Down But Not Out*, 65 Ind. L.J. 141, 150–53 (1989) [hereinafter Note] (discussing cases in which vagueness doctrine was applied to common law and statutory penalties, both civil and criminal).

For example, in 1860, Pennsylvania enacted a statute which provided that when a defendant was acquitted, the jury had to determine whether the county, the prosecutor, or the defendant "shall pay the cost [of the litigation]." *Giaccio*, 382 U.S. at 400–01, 86 S.Ct. at 519–20 (*quoting* Act of March 31, 1860, Pub.L. 427, § 62, Pa.Stat. Ann., Tit. 19, § 1222). Without further guidance by giving criteria as to the circumstances under which any of those parties may bear the costs, the statute provided that the court enter a "sentence" in the amount of costs determined by the jury and commit the person so charged to jail until the costs were paid. *Id.* The Supreme Court held that the statute was invalid in violation of the due process clause "because of vagueness and the absence of any standards sufficient to enable defendants to protect themselves against arbitrary and discriminatory impositions of costs." *Id.* at 402, 86 S.Ct. at 520. Applying the basic requirement of due process, the Court stated that a statute is unconstitutionally vague and standardless when

> it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case.... This 1860 Pennsylvania Act contains no standards at all, nor does it place any conditions of any kind upon the jury's power to impose costs....

*Id.* at 402–03, 86 S.Ct. at 520–21 (citations omitted). Just as the argument is currently made to defend the South Carolina punitive damages scheme, the Commonwealth of Pennsylvania argued that the discretion given to the jury under the Pennsylvania act was checked by post-verdict court review, because the courts in their decisions had applied the statute against the defendants only when the defendants' conduct, "though not unlawful, is 'reprehensible in some respect,' 'improper,' outrageous to 'morality and justice.' " *Id.* at 404, 86 S.Ct. at 521. Rejecting that argument, the Supreme Court noted that "the so-called court-created conditions and standards still leave to the jury such broad and unlimited power in imposing costs on acquitted defendants that the jurors must make determinations of the crucial issue upon their own notions of what the law should be instead of what it is." *Id.* at 403, 86 S.Ct. at 521. *See also Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its mean-

---

**4.** The idea that one should be able to guide one's conduct based on settled expectations goes beyond the principle of due process to pervade most aspects of our society. *See, e.g., Official Baseball Rules*, Notes (to the definition of the "strike zone") (1955):

> A batter has the right to expect that the area he is protecting shall be the same from day to day. Necessity for split-second decision by the batter makes it imperative that umpires practice diligently to attain a sameness in their estimation of the strike zone.

But even the predictability of these rules are threatened when their interpretation becomes an act of arbitrary will. *See* G. Will, *Men at Work* 106 (1990) ("Bart Giamatti said people look to games for 'stable artifice,' an island of clear rules, of predictable governance in a world of flux. If that is what fans are looking for, they should not look too closely at the strike zone.").

ing and differ as to its application, violates the first essential of due process of law.").

Although the principles of due process requiring reasonable certainty in the law were applied in *Giaccio* and *Connally* to the imposition of liability, *see Haslip,* 111 S.Ct. at 1046 n. 12, the principles are equally applicable to sanctions. *Cf. United States v. Batchelder,* 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979) (availability of two possible sentences did not violate due process); *United States v. Evans,* 333 U.S. 483, 68 S.Ct. 634, 92 L.Ed. 823 (1948) (uncertainty as to nature of offense and applicable penalty rendered judicial interpretation impossible). An argument that prior knowledge of a sanction is less important than knowledge of the conduct to which the sanction applies has some merit. But it does not minimize the need that even the sanction have a rational basis for application. Otherwise the law has no form, predictability or equality in application and becomes the product of the unique will of the sanction-giver at the time it is imposed. *See generally* Note, 65 Ind. L.J. at 153–55.

Although punitive damages have long been recognized, the early reasons given for their award were uncertain, and only recently when punitive damages have been awarded with increasing frequency, has a significant attack on them mounted.

The first reported punitive damages cases in England were decided in 1763. *Wilkes v. Wood,* 1 Lofft 1, 98 Eng.Rep. 489 (K.B.1763); *Huckle v. Money,* 2 Wils. 205, 95 Eng.Rep. 768 (K.B.1763). Punitive damages made their appearance in the United States some 20 to 30 years later. *See, e.g., Genay v. Norris,* 1 S.C.L. (1 Bay) 6 (1784); *Coryell v. Colbaugh,* 1 N.J.L. 90 (1791); *Stout v. Prall,* 1 N.J.L. 93 (1791). A South Carolina jury in *Genay v. Norris* awarded "very exemplary damages" in 1784 to a plaintiff who experienced "excruciating pain" from a drink that the defendant had spiked with cantharides (Spanish fly). Although there was no suggestion that evidence of specific economic damages was presented, the jury nevertheless awarded plaintiff 400 pounds on instructions by the court that the defendant "wrought a very serious injury to the plaintiff, and such a one as entitled him to *very exemplary damages.*" 1 S.C.L. (1 Bay) at 7 (emphasis added).

The grounds identified for awarding punitive damages in the earlier cases appear to have been based generally on the inadequacy of the existing standards for awarding compensatory damages. Under one theory, when the breach of a duty caused mental anguish, which was not legally compensable because it is not susceptible to exact pecuniary value, awards were amplified to allow additional damages. Similarly, when juries awarded excessive damages in cases where the injury was attended by "malice, oppression or gross fraud," the courts were reluctant to interfere with verdicts. Thus, compensation for indignity and suffering, injuries for which compensation was not ordinarily available, was permitted on the ground that the conduct should be exemplified or should be punished. *See* 1 J. Ghiardi & J. Kircher, *Punitive Damages, Law and Practice* § 1.02 (Callaghan & Co.1985); *see also* American College of Trial Lawyers, *Report on Punitive Damages of the Committee on Special Problems in the Admin. of Justice* 8–9 (Mar. 3, 1989) [hereinafter *Report on Punitive Damages* ]. Vestiges of these historical principles remain in the South Carolina law to the extent that punitive damages are still described as a vindication of a private right. *See Harris v. Burnside,* 261 S.C. 190, 199 S.E.2d 65, 68 (1973).

Although the histories of the development of damages for pain and suffering and for punitive damages reveal a common heritage, in more recent times, uncritical acceptance of both has led to a separate recognition of each. Even though the law of compensatory damages now permits awards for mental anguish and suffering, and the expanded array of criminal offenses provides punishment for most of the grounds originally advanced for awarding punitive damages, punitive damages nevertheless continued in the jurisprudence on the basis that they had, for differing reasons, been available earlier.

104

Any suggestion that punitive damages were readily and rationally applied as the law of the land at the time that the due process clause was incorporated into the Constitution in 1791 has a weak foundation. *But see Haslip,* 111 S.Ct. at 1055 (Kennedy, J., concurring). Few cases have been identified which discussed the concept of punitive damages at that time and awards of punitive damages were largely an exception to the then-existing jurisprudence of damages.

While the Supreme Court first discussed the propriety of punitive damages in *Day v. Woodworth,* 54 U.S. (13 How.) 363, 371, 14 L.Ed. 181 (1851), it was not until recently that members of the Court, on various occasions, acknowledged a concern about whether state schemes for awarding punitive damages lacked adequate standards as required by due process. *See, e.g., Browning–Ferris,* 492 U.S. at 281, 109 S.Ct. at 2923 (Brennan, J., joined by Marshall, J., concurring); 492 U.S. at 283, 109 S.Ct. at 2924–25 (O'Connor, J., joined by Stevens, J., concurring in part and dissenting in part); *Bankers Life & Casualty Co. v. Crenshaw,* 486 U.S. 71, 86–89, 108 S.Ct. 1645, 1654–56, 100 L.Ed.2d 62 (1988) (O'Connor, J., joined by Scalia, J., concurring in part and concurring in the judgment). The watershed decision, however, was handed down this year in *Haslip.*

In *Haslip,* the Supreme Court upheld the Alabama scheme for awarding punitive damages against an attack that awards in Alabama had become the product of "unbridled jury discretion" in violation of the Due Process Clause of the Fourteenth Amendment. Recognizing that unlimited jury discretion in the fixing of punitive damages could result in a constitutionally infirm award, 111 S.Ct. at 1043, the Court

concluded that the two-level review of any award by the state trial court and the state appellate court, as established by Alabama law, provided a "sufficiently definite and meaningful constraint on the discretion of Alabama fact finders in awarding punitive damages" to satisfy the requirements of due process. *Id.* at 1045. The Court noted in particular that review by the Alabama Supreme Court, which takes into account an elaboration of seven relevant factors,[5] "ensures that punitive damages awards are not grossly out of proportion to the severity of the offense and have some understandable relationship to compensatory damages." *Id.* In fact, the Court cited cases decided by the Alabama Supreme Court in which the court actually reduced awards based on a review of the factors which include independent facts not before the jury. *See, e.g., United Serv. Auto. Ass'n v. Wade,* 544 So.2d 906, 917 (Ala.) ("We are of the opinion that the award of $3,500,000 punitive damages is excessive and should be reduced by $1,000,000."), *stay denied,* 492 U.S. 930, 110 S.Ct. 7, 106 L.Ed.2d 623 (1989); *Wilson v. Dukona Corp., N.V.,* 547 So.2d 70, 74 (Ala.1989) (the court remitted $21,450 in punitive damages based on facts which were not presented to the jury, even though the court acknowledged that the evidence before the jury "warranted" the jury's making the award). In reaching its decision in *Haslip,* the Court was careful to observe that the Alabama scheme approved there was distinguishable from the schemes in Vermont and in Mississippi "about which Justices expressed concern" in *Browning–Ferris* (Vermont) and in *Bankers Life* (Mississippi). *Haslip* 111 S.Ct. at 1045 n. 10. The Court elaborated,

**5.** The seven factors considered by the Alabama Supreme Court are:

(a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to

the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the "financial position" of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation.

111 S.Ct. at 1045.

In those respective schemes [Vermont and Mississippi], an amount awarded would be set aside or modified only if it was "manifestly and grossly excessive," *Pezzano v. Bonneau*, 133 Vt. 88, 91, 329 A.2d 659, 661 (1974), or would be considered excessive when "it evinces passion, bias and prejudice on the part of the jury so as to shock the conscience," *Bankers Life & Casualty Co. v. Crenshaw*, 483 So.2d 254, 278 (Miss.1985).

*Id.*

In *Browning–Ferris*, although the Court never reached the due process issue, the Court observed about the Vermont scheme:

The parties agree that due process imposes some limits on jury awards of punitive damages, and it is not disputed that a jury award may not be upheld if it was the product of bias or passion, or if it was reached in proceedings lacking the basic elements of fundamental fairness.

492 U.S. at 276, 109 S.Ct. at 2921. Justice Brennan, joined by Justice Marshall, wrote separately to concur with the understanding that the door was still open as to whether "the Due Process Clause constrains the imposition of punitive damages in civil cases brought by private parties." *Id.* at 280, 109 S.Ct. at 2923 (Brennan, J., concurring). Justice O'Connor, joined by Justice Stevens, agreed with Justice Brennan's observation, noting that "[a]wards of punitive damages are skyrocketing." *Id.* at 282, 109 S.Ct. at 2924 (O'Connor, J., concurring in part and dissenting in part). Similarly, in *Bankers Life*, where again the due process issue was not reached, Justice O'Connor, joined by Justice Scalia, commented on the Mississippi scheme, stating:

Mississippi law gives juries discretion to award any amount of punitive damages in any tort case in which a defendant acts with a certain mental state. In my view, because of the punitive character of such awards, there is reason to think that this may violate the Due Process Clause.

486 U.S. at 87, 108 S.Ct. at 1655 (O'Connor, J., concurring in part and concurring in the judgment). For a similar expression about punitive damages by then Associate Justice Rehnquist, see *Smith v. Wade*, 461 U.S. 30, 59, 103 S.Ct. 1625, 1641–42, 75 L.Ed.2d 632 (1983) (Rehnquist, J., dissenting).

Thus, while the Supreme Court in *Haslip* did not say as much, the inference is left that the broad discretion given juries under the laws of Vermont and Mississippi is not adequately checked by court review based on a standard of excessiveness. The same inference is applicable to the South Carolina scheme, where the discretion given to the jury is apparently somewhat broader than that given in Vermont and Mississippi, and yet the standard for court review similar. In South Carolina, the courts are not required to instruct the jury on a notion of proportionality, and the net worth of the defendant, while relevant, is not a limiting factor.

When a jury is left to its own devices to take property or mete out punishment to whatever extent it feels is best in the course of the process, our sensibilities about that process are offended. It is just this aspect about the South Carolina process that leads us to conclude that the scheme violates the first principle of due process. In circumstances where conduct is found to be reckless, gross or wanton, a jury instructed under South Carolina law is permitted to assess any amount that it feels appropriate to punish or to deter, without any meaningful standard or limitation, and the jury was given that discretion in this case. The court instructed the jury to enter punitive damages in such "sum as you believe" will punish and deter. Because no guidance is required by South Carolina law, a reviewing court could not rationally decide that the amount was excessive without simply substituting its notion of excessiveness for that of the jury. Therefore, any award except the most extraordinary and shocking would have to be left standing because standards of excessiveness are substantially undefined.

If Congress were to enact a statute that provides that "anyone who wantonly or recklessly breaches an existing duty of law becomes subject to a penalty in an amount that the fact finder wishes to enter," consensus would readily be reached to strike it

down for being vague and lacking meaningful standards. Similarly, punitive damages awarded under the law of South Carolina are the product of the subjective feeling of a particular jury in a particular courtroom applying what they think "the law should be instead of what it is." *Giaccio*, 382 U.S. at 403, 86 S.Ct. at 521. When we recognize that under a rule of law, principles of law are announced in advance so that the law can be known and the people can conform their conduct accordingly, an award of punitive damages which is entered without a legal standard is unacceptable, regardless of the amount.

The only possible argument for saving the South Carolina punitive damages scheme against an attack for vagueness and lack of standards is the idea that the trial court supervises the jury with the power to grant a new trial when the award is "excessive." The difficulty immediately apparent, however, is that no criteria are provided against which to measure excessiveness. Compensatory damages can be found excessive against evidence offered as to the actual damages caused, and the evidence on the actual damages caused is controlled by principles of causation, admissibility, and reasonableness of actual expenses incurred. When a court reviews an award of punitive damages, it can only test the jury's award against its own notion of excessiveness. Apparently, the Court in *Haslip* concurs in the assessment that a standard of "excessiveness" is not meaningful. *See* 111 S.Ct. at 1045 n. 10.

The fact that review by the trial court is in this case conducted under federal law is not ameliorating because any review must be based on a jury verdict measured against the facts and a meaningful standard provided by State law. When no meaningful State law standard or limit is given to the jury on the amount of punitive damages to be awarded, it can hardly be urged that the jury acted beyond the evidence or not in compliance with the court's instructions. The remaining possibility for review, that a miscarriage of justice resulted, returns to the problem expressed in connection with a standard of excessiveness.

## V

Since the argument in this case, the Supreme Court of South Carolina adopted on June 24, 1991, a more elaborate post-trial review to be conducted in the future by state trial courts in an attempt to avoid due process challenges. In *Gamble v. Stevenson*, 406 S.E.2d 350 (1991), the court announced new factors to be considered for posttrial review by South Carolina state courts to bring the practice in line with that approved in *Haslip*. The court stated:

Hereafter, to ensure that a punitive damage award is proper, the trial court shall conduct a post-trial review and may consider the following: (1) defendant's degree of culpability; (2) duration of the conduct; (3) defendant's awareness or concealment; (4) the existence of similar past conduct; (5) likelihood the award will deter the defendant or others from like conduct; (6) whether the award is reasonably related to the harm likely to result from such conduct; (7) defendant's ability to pay; and finally, (8) as noted in *Haslip*, "other factors" deemed appropriate.

Upon completing its review, dedicated to the postulate that no award be grossly disproportionate to the severity of the offense, the trial court shall set forth its findings on the record.

*Id.* at 354.

Although it is not made clear in *Gamble* whether the state trial court must conduct a separate post-trial hearing to explore the factual predicate on any relevant factor, that may be inferred from the imposed requirements that the trial court "conduct a post-trial review" and make findings on the record. Providing standards to follow in the course of the review, the court not only permits consideration of the *Haslip* factors, but directs that no punitive damages award be "grossly disproportionate" to the severity of the conduct. Without the benefit of reported experience with the new procedure, it would appear that state courts in South Carolina will hereafter op-

erate under the same process held constitutional in *Haslip*.

In view of our ruling that grants Dallas Carrier a new trial, we must provide guidance to the district court on retrial, applying South Carolina punitive damages law as altered by *Gamble*.

■ Because a new trial will be conducted in federal court, the new South Carolina procedures for post-trial review would not be applicable. Rather, the district court must apply Rules 50(b) and 59, which permit the court to interfere with a verdict, under Rule 50, only where no substantial evidence is offered on which the jury can base its award, *Defender Indus.*, 938 F.2d at 505, and, under Rule 59, only where the verdict is "against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice." *Id.* at 507 (*quoting Aetna Casualty & Sur. Co. v. Yeatts*, 122 F.2d 350, 352 (4th Cir.1941)). In addition, any review by the district court of an award of punitive damages also remains subject to the limitations of the Seventh Amendment. *See id.* at 507 ("we hold that the seventh amendment guarantees the right to a jury determination of the amount of punitive damages").

■ The Seventh Amendment directs that facts decided by a jury may not be "reexamined" by a federal court, other than "according to rules of the common law." The common law referred to in the Amendment is the common law of England as it existed in 1791. *Baltimore & Carolina Line, Inc. v. Redman*, 295 U.S. 654, 657, 55 S.Ct. 890, 891–92, 79 L.Ed. 1636 (1935). *See also United States v. Wonson*, 28 F.Cas. 745, 750 (C.C.D.Mass.1812) (No. 16,-750) (Story, Circuit Justice) ("Beyond all question, the common law here alluded to [in the Seventh Amendment] is not the common law of any individual state, ... but it is the common law of England, the grand reservoir of all our jurisprudence."). The Seventh Amendment was adopted in 1791 after a fear had developed during the debates over ratification of the Constitution whether the right to jury trial in civil cases was adequately preserved by the original Constitution. By the express guarantee of the Seventh Amendment, the right of jury trial in civil cases was thus secured "in the fullest latitude of the common law" and placed "upon the high ground of constitutional right." J. Story, *Commentaries on the Constitution of the United States* § 919 at 654 (Rotunda & Nowak ed. 1987).

The common law in 1791 permitted a court to review jury verdicts by two methods—by sustaining a demurrer to the evidence and by ordering a new trial. A demurrer to the evidence was available when no evidence was offered to prove the particular fact. As Chief Justice Marshall explained the practice,

> The party demurring admits the truth of the testimony to which he demurs, and also those conclusions of fact which a jury may fairly draw from that testimony. Forced and violent inferences he does not admit; but the testimony is to be taken most strongly against him, and such conclusions as a jury might justifiably draw, the court ought to draw.

*Pawling v. United States*, 8 U.S. (4 Cranch) 219, 221–22, 2 L.Ed. 601 (1808). The court, however, could never remove from the jury the function of weighing evidence and determining the credibility of witnesses. Because a demurrer to the evidence required the moving party to admit the evidence against him and withdraw the case from the jury, the high risk to the moving party chilled its use. *See Suydam v. Williamson*, 61 U.S. (20 Howard) 427, 436, 15 L.Ed. 978 (1857). The motion for a directed verdict was thereafter adopted as a benign modification. *See Parks v. Ross*, 52 U.S. (11 Howard) 362, 373, 13 L.Ed. 730 (1850). The directed verdict practice permitted the moving party to admit the truth of plaintiff's facts for purposes of the motion only, permitting him to continue his defense if the motion was denied. The standard under either the demurrer or the directed verdict motion, however, remained the same—whether there was evidence from which the jury could find the fact. No authority from any time has been found that the court can substitute its judgment

for that of the jury on a matter properly committed to it.

That is not to say, however, that the court was without authority to correct error when the jury failed to follow instructions given to it, or was motivated extraneously by evidence outside the record or otherwise, or simply produced a manifestly unjust result. Although the court could not substitute its finding for that of the jury, it could remove the case from the jury that was impaneled and recommit it to a new jury by ordering a new trial. The long-standing practice was in essence a veto right of the court over the jury's process, which while not permitting the court to enter its own judgment, permitted it to reject that of the jury when it strayed. As Justice Story explained the court's role,

> It is indeed an exercise of discretion full of delicacy and difficulty. But if it should clearly appear that the jury have committed a gross error, or have acted from improper motives, or have given damages excessive in relation to the person or the injury, it is as much the duty of the court to interfere, to prevent the wrong, as in any other case.

*Blunt v. Little*, 3 F. Cas. 760, 761–62 (C.C.D.Mass.1822) (No. 1,578) (Story, Circuit Justice). This language was cited with approval by the Supreme Court in *Arkansas Valley Land & Cattle Co. v. Mann*, 130 U.S. 69, 73, 9 S.Ct. 458, 459, 32 L.Ed. 854 (1889), and remains a standard for granting a new trial in the Fourth Circuit. We have stated:

> The motion to set aside the verdict and grant a new trial was a matter of federal procedure, governed by Rule of Civil Procedure 59 and not subject in any way to the rules of state practice. On such a motion it is the duty of the judge to set aside the verdict and grant a new trial, if he is of opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict. The exercise of this power is not in derogation of the right of

trial by jury but is one of the historic safeguards of that right.

*Aetna Casualty*, 122 F.2d at 352–53. And this standard was confirmed recently in *Defender Indus.*, 938 F.2d at 507.

 The right to jury trial secured by the Seventh Amendment thus reserves the weighing of evidence and the finding of facts exclusively to the jury. When a jury has not been presented with substantial evidence to make a finding, the finding can be reversed by the trial court. When the jury commits error in the application of the law, relies on facts not before it or bases its decision on improper motives, or reaches a result that is against the clear weight of the evidence or is manifestly unjust, the court may withdraw the case from that jury and order a trial before another jury. In either case, however, the court cannot, consistent with the Seventh Amendment, evaluate a jury's verdict based on evidence that the jury was not permitted to consider at trial or on a legal standard not given to the jury. These rights secured by the Seventh Amendment form the basis of current jurisprudence developed around Rules 50(b) and 59, Fed.R.Civ.P.

 A *Haslip*-type post-trial review, insofar as it is a *quasi* de novo review by which the court reviews facts, some of which may not have been presented to the jury, would be inconsistent with the restrictions of the Seventh Amendment. When a factual issue is committed to the jury, as punitive damages are under federal law, *see Defender Indus.*, 938 F.2d at 507, the court cannot substitute its judgment for that of the jury. Rather it can only grant a new trial, and then only under the standards permitted by federal law. *See Browning–Ferris*, 492 U.S. at 279, 109 S.Ct. at 2922.

## VI

Our holding that the South Carolina scheme for awarding punitive damages applied by a federal court denied the defendant of due process leaves the question of whether a new trial can be ordered. Although state court juries in South Carolina will be permitted hereafter to award puni-

tive damages under a scheme similar to that held constitutional in *Haslip*, a federal court cannot apply the *Gamble* post-verdict review process, leading to the anomalous result that a decision on a claim for punitive damages could be significantly different depending on whether the case was tried in a federal court.

Although federal procedures are not intended to have substantive effect, *see* 28 U.S.C. § 2072(b), no principle guarantees that a case tried under federal procedure will reach the same outcome that would be reached had the same case been tried under a state procedure. In *Hanna v. Plumer*, 380 U.S. 460, 466–67, 85 S.Ct. 1136, 1141–42, 14 L.Ed.2d 8 (1965), the Supreme Court noted that an " '[o]utcome-determination' analysis was never intended to serve as a talisman." Rather, "choices between state and federal law are to be made not by application of any automatic, 'litmus paper' criterion, but rather by reference to the policies underlying the *Erie* rule." *Id.* at 467, 85 S.Ct. at 1141–42. The Court concluded that these policies—the discouragement of forum-shopping and the avoidance of inequitable administration of the laws—were not offended by the application of the federal rule for service of process, even though the outcome of litigation could differ if the state rule for service of process were applied at that stage of the proceedings. *Id.* at 466–69, 85 S.Ct. at 1141–43. The difference in the state and federal service of process rules would be "of scant, if any, relevance to the choice of a forum" in the first instance. *Id.* at 469, 85 S.Ct. at 1142–43.

Heeding the analysis of *Hanna*, we noted in *Wratchford v. S.J. Groves & Sons Co.*, 405 F.2d 1061, 1064 (4th Cir.1969), that the *Erie* doctrine cannot be applied in terms of an "outcomedeterminative" test or merely by asking whether a rule is "substantive" or "procedural." We added:

> In a diversity case, state law defining and limiting[the] primary rights and obligations [of the parties] must be applied under the *Erie* doctrine, enabling members of society prudently to plan and conduct their affairs, whether their conduct will later be called into question in a state or a federal court.

*Id.* at 1065. With this guideline, we determined that the question of how much evidence is sufficient to send a case to the jury in a diversity case should be answered by application of federal and not state law. *Id.* at 1065–66.

In this case our review of South Carolina law reveals that the review mandated for state judges at the time the district court conducted its review in this case was no more elaborate than that permitted by federal Rules 50 and 59. Accordingly, any distinction would not be of such substance as to encourage forum-shopping and cause a discriminate application of the South Carolina law of punitive damages. However, in view of the decision by the Supreme Court of South Carolina in *Gamble*, issued on June 24, 1991, the review to be conducted *"hereafter"* by trial courts in South Carolina will parrot the review conducted by the Alabama Supreme Court as described in *Haslip*, and the potential for a different result becomes sufficiently significant so that fora might be selected on that basis. Although we do not yield to an "outcome-determination" test in this case, we believe that a proper pre-verdict application of South Carolina law hereafter in the federal courts can yield a scheme consistent with that adopted in *Gamble*.

The decision in *Gamble* makes no mention about any change in the instructions to be given to the jury. This is a particularly meaningful omission for federal courts which review verdicts under federal review standards. We believe that the standards adopted by the South Carolina Supreme Court in *Gamble* are nevertheless intended to be the basis for all awards of punitive damages in South Carolina.

■ Accordingly, until stated otherwise by the South Carolina Supreme Court, we direct that on remand South Carolina's new standard for post-trial review be incorporated by the district court in its instructions to the jury. If the plaintiff demonstrates an entitlement to punitive damages, we direct that the district court's instructions on the amount of punitive damages

that may be awarded include instruction on four aspects, which are derived from *Gamble* and *Haslip:*

(1) *Relationship to harm caused:* Any penalty imposed should take into account the reprehensibility of the conduct, the harm caused, the defendant's awareness of the conduct's wrongfulness, the duration of the conduct, and any concealment. Thus any penalty imposed should bear a relationship to the nature and extent of the conduct and the harm caused, including the compensatory damage award made by the jury.

(2) *Other penalties for the conduct:* Any penalty imposed should take into account as a mitigating factor any other penalty that may have been imposed or which may be imposed for the conduct involved, including any criminal or civil penalty or any other punitive damages award arising out of the same conduct.

(3) *Improper profits and plaintiff's costs:* The amount of any penalty may focus on depriving the defendant of profits derived from the improper conduct and on awarding the costs to the plaintiff of prosecuting the claim.

(4) *Limitation based on ability to pay:* Any penalty must be limited to punishment and thus may not effect economic bankruptcy. To this end, the ability of the defendant to pay any punitive award entered should be considered.

 Recognizing that our interim directions may be applied beyond this case, we observe that, when it is determined that the evidence relevant to the appropriate amount of punitive damages will be prejudicial to the jury's consideration of liability or compensatory damages, bifurcation of the trial under Fed.R.Civ.P. 42(b) remains an available solution. *See Report on Punitive Damages* at 18–19; Wheeler, *The Constitutional Case for Reforming Punitive Damages Procedures*, 69 Va.L.Rev. 269, 300–02 (1983). Whenever the district court orders a bifurcated trial, the jury should be required, in the first phase, to determine whether punitive damages are to be awarded, and only if its verdict so determines, should it be presented in the second phase with the evidence relevant to the factors for finding the appropriate amount. In this case, however, where the new trial is limited to the issue of punitive damages, a bifurcation would probably not become necessary.

## VII

Dallas Carrier's other contentions of error are that (1) the district court erred in permitting a lay witness to give an opinion about the adequacy of emergency flashers, (2) the evidence was insufficient to support the verdicts, and (3) the district court improperly instructed the jury. We reject each of them.

### A

At trial the Mattisons offered and the court admitted over objection the testimony of Ms. Dina Busha that the emergency flashers on the tractor trailer did not provide an adequate warning "[u]nder the conditions of the weather at the time." Dallas Carrier contends that it was reversible error to admit this testimony.

 Rule 701, Fed.R.Evid., permits a lay witness to give an opinion if it (a) is based on the observation of the witness and (b) explains the witness' testimony or is probative of a fact in issue. If the requirements of the rule are satisfied, the evidence should usually be admitted. *See United States v. Gould,* 741 F.2d 45, 51 n. 6 (4th Cir.1984). In any event, we review the ruling of the district court only for an abuse of discretion. *United States v. Robinson,* 804 F.2d 280, 282 (4th Cir.1986).

 Ms. Busha's testimony arguably satisfies both prongs of Fed.R.Evid. 701. She witnessed the accident and formed an opinion about the truck's flashers as she observed them under the weather conditions on Secondary Road 107 at the time. Her testimony explained her observations on the effectiveness of the tractor trailer's emergency flashers to provide a warning. While the question is a close call and we must be always mindful to guard against lay witness testimony when it involves "meaningless assertions which amount to

little more than choosing up sides," Fed. R.Evid. 701, Advisory Committee Note, we cannot say that the district court abused its discretion in the circumstances of this case in admitting Ms. Busha's lay opinion testimony.

## B

■ Dallas Carrier contends that the evidence did not support the jury's finding of liability and the amount of compensatory damages found. In particular it contends that as a matter of law Mr. Mattison was driving too fast for conditions. This, however, is peculiarly a factual question for resolution by the jury. The evidence that he was going 20 m.p.h. at the time cannot as a matter of law be the basis for withdrawing the question from the jury. Moreover, the jury could have found from the evidence that Dallas Carrier's driver was reckless, a basis of liability for which Mr. Mattison's alleged contributory negligence would not be a defense. *See, e.g., Dudley Trucking Co. v. Hollingsworth,* 243 S.C. 439, 134 S.E.2d 399, 402 (1964) ("[C]ontributory negligence is not a defense when the injury complained of is shown to have been wilfully or recklessly done.").

■ Similarly, the awards of $100,000 in compensatory damages for Mr. Mattison and $25,000 for Mrs. Mattison were supported by the evidence. Mr. Mattison incurred $28,903.26 in medical expenses, and there was ample evidence of pain and an aggravated disability caused by the accident. Mrs. Mattison incurred medical expenses of $12,805.43, and although there was conflicting evidence about whether a large portion of those expenses was incurred to treat an accident-related injury, the jury could reasonably have believed testimony that suggested that all of her medical expenses were related to the accident. As was the case with Mr. Mattison,

there was also ample evidence of pain and suffering experienced by Mrs. Mattison.

## C

Finally, Dallas Carrier charges error with two aspects of the jury instructions.

■ First, Dallas Carrier contends that the district court erred in refusing to instruct the jury specifically that Mr. Mattison had a duty to reduce his driving speed in adverse weather conditions. In view of the instruction actually given, we do not find that the jury was not adequately and properly instructed on the point.[6]

The second aspect of the instructions with which Dallas Carrier takes issue is more problematic. In instructing the jury on Dallas Carrier's net worth as relevant to punitive damages, the district court informed the jury that the amount was "in the neighborhood of a little over a half-million dollars." The correct figure for 1989, the last year for which an amount was available, was $6,428. The half-million dollar figure was applicable for the year before.

Although the jury was given the actual financial records from which it could obtain the correct figure, the court's statement was in error. It appears, however, that Dallas Carrier failed to preserve an objection. During the trial the jury had been informed by the Mattisons that Dallas Carrier had assets (gross, not net) of $8 million. When Dallas Carrier objected to the comment as misleading, the district court attempted to correct the error by telling the jury in the instructions that the net worth figure was actually $500,000. After the instructions were given, the following dialogue took place:

THE COURT: All right. What about that statement, put that in evidence [the actual financial statements], since I said it would be for them in evidence.

---

6. The court instructed the jury that:
A plaintiff may be contributorily negligent if he is forgetful of a known danger, or if he is inattentive to a known danger.
In this light, I charge you that no person shall operate a vehicle on a highway *at a*

*speed that is greater than is reasonable and prudent under the circumstances* and conditions existing, and having due regard for the actual and potential hazards then existing. (Emphasis added.)

COUNSEL FOR DALLAS CARRIER [MR. LYALL]: Yes, sir, I don't object to it being in evidence, it is 1989 net worth was only $6,000.

THE COURT: What is the other one?

MR. LYALL: In 1988 it was half-million dollars, you were correct, 1988.

THE COURT: Okay. Is everybody happy with what I said?

COUNSEL FOR THE MATTISONS [MR. CODE]: We [are] not displeased, Your Honor.

Counsel for Dallas Carrier then went on to note three objections, but he did not again refer to the net worth issue.

■ In order to preserve an objection to the instructions to the jury, a party is required to point out specifically the nature of the objection. *See* Fed.R.Civ.P. 51 ("No party may assign as error the giving or the failure to give an instruction unless that party objects thereto … stating distinctly the matter objected to and the grounds of the objection.").

■ In this case had Dallas Carrier made an objection, the court could easily have directed the jury to the actual financial record in evidence and read the $6,000-net worth figure from it, thereby totally correcting the the misstatement. Because no objection was preserved, Dallas Carrier permitted the misstatement to stand. It cannot now on appeal advance the issue for the first time as a ground for reversal.

For the reasons given, we affirm the judgment insofar as compensatory damages are awarded, and reverse the award of punitive damages for a new trial.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.