DEFENDER INDUSTRIES, INC., Kathryn Inabinet Vickery, and the Kathryn Inabinet Vickery Marital Trust, Plaintiffs,

v.

NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, Defendant.

Civ. A. No. 3:88–3231–17.

United States District Court, D. South Carolina, Columbia Division.

April 29, 1992.

T. English McCutcheon, III, John Calvin Bradley, Jr., Whaley, McCutcheon, Blanton & Rhodes, Columbia, SC, for plaintiffs.

David W. Robinson, II, David Clay Robinson, D. Reece Williams, III, Robinson, McFadden & Moore, Columbia, SC, for defendant.

JOSEPH F. ANDERSON, Jr., District Judge.

This action is before the court upon motion of the defendant, Northwestern Mutual Life Insurance Company (Northwestern), for a new trial. Also before the court is the issue, raised by the court *sua sponte*, of whether the court should instead order a new trial *nisi* remittitur. For the reasons set forth below, the motion for a new trial outright is denied. However, the court will order a new trial *nisi* remittitur.

This action was initially tried by The Honorable Karen Henderson, United States District Judge, in September 1989. The jury returned a verdict for the plaintiff, Defender Industries, Inc. (Defender),[1] for actual and constructive fraud. The fraud verdict was based upon evidence indicating that Northwestern fraudulently promised a partial premium refund on an $8 million life insurance policy that Defender purchased. The evidence also disclosed that when Defender sought to assert its rights under the promise, Northwestern threatened to cause Defender's largest customer to take its business elsewhere. The jury awarded actual damages in the amount of $106,513.74 and punitive damages in the amount of $5 million. Relying upon the authority granted to the district court in *Shamblin's Ready Mix, Inc. v. Eaton Corp.*, 873 F.2d 736 (4th Cir.1989), Judge Henderson reduced the punitive award to $10,000. *Defender Indus., Inc. v. Northwestern Mut. Life Ins. Co.*, 727 F.Supp. 252 (D.S.C.1989). On appeal, the United States Court of Appeals for the Fourth Circuit, sitting *en banc*, reversed the *Shamblin's* precedent and held that the Seventh Amendment prevents a district court from ordering a puni-

---

1. The party plaintiffs in the present action include Defender Industries, Inc., Kathryn Inabinet Vickery, and the Kathryn Inabinet Vickery Marital Trust. *See infra* at p. 406. References throughout this opinion to Defender shall include the other party plaintiffs as well.

tive damage verdict reduced to a sum certain upon a finding that the damage award was excessive. *Defender Indus., Inc., v. Northwestern Mut. Life Ins. Co.*, 938 F.2d 502 (4th Cir.1991) (en banc). Because of this, the court reversed Judge Henderson's decision to set the punitive award at $10,000. Judge Henderson had alternatively found that the punitive damage verdict returned by the jury was so excessive as to warrant a new trial on the amount of the punitive award. The Fourth Circuit determined that the alternative disposition formulated by Judge Henderson was not an abuse of discretion. The case was thus remanded to this court for a new trial limited solely to the amount of the punitive award. In a footnote, the Fourth Circuit suggested that the court might wish to consider the appropriateness of granting a new trial *nisi* remittitur. 938 F.2d at 507 n. 1.

Judge Henderson was thereafter appointed to the United States Court of Appeals for the District of Columbia, and this case was transferred to the undersigned for resolution. When the file was received from the Fourth Circuit, this court held a status conference with the attorneys to discuss the feasibility or desirability of this court reviewing the entire transcript and ordering a new trial *nisi* remittitur. Initially, the court was inclined to attempt such a procedure. Before this could be done, however, the United States Court of Appeals for the Fourth Circuit decided *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95 (4th Cir.1991). The *Mattison* decision significantly altered the law of punitive damages in South Carolina. Because the legal landscape had thus changed in the interim, this court determined that a new trial was appropriate.

The action was retried February 4–7, 1992. Although the new trial was limited to the question of the amount of the punitive award, what in essence occurred was, with two exceptions noted below, a virtual retrial of the original action. Unlike a retrial involving an award of compensatory damages, a retrial of a punitive award requires the new jury to be exposed to the facts giving rise to liability. This is necessary because the new jury must acquire an appreciation of the wrongfulness of the conduct in order to consider that factor, as well as others, in fashioning an appropriate award.[2] Also, because the *Mattison* decision had identified new factors for juries to consider in determining the amount of a punitive award, the defendant was permitted, over the strenuous objection of the plaintiff, to offer testimony in an area that was not developed at the first trial. Specifically, Northwestern was allowed to introduce testimony regarding the civil and administrative penalties, which the South Carolina Insurance Commission could have and might impose against Northwestern for the conduct at issue here. The defendant was also allowed to introduce testimony that it would have been illegal, under South Carolina law, for Northwestern to make a partial premium refund as its agents had promised. At the conclusion of the trial, the court instructed the jury in compliance with the *Mattison* decision. The jury returned a punitive damage award in the amount of $25 million, exactly five times the punitive award rendered by the first jury.

**2.** The retrial proved difficult, from a procedural point of view, because the parties engaged in what amounted to a running debate over what "already had been decided" in the first trial. For example, Defender contended that the first trial resulted in a finding that Northwestern's home office was aware of the fraud and attempted to conceal it. Although the Fourth Circuit commented that one reasonable interpretation of the evidence would lead to such a conclusion, 938 F.2d at 504, this court could not say, as a matter of law, that this question was "decided" at the first trial (and thus relitigation of this issue was foreclosed) because the first jury had returned only a general verdict. In light of the general verdict, the court ruled that the only factual issues that had been finally decided were that:

1. An agent of Northwestern made a fraudulent misrepresentation to Defender; and
2. Defender suffered actual damages as a direct and proximate result.

In essence, then, the court required Defender to reprove much of its case (i.e., the subsequent threat, home office involvement, etc.). As noted, *infra* at p. 410, Defender clearly was able to again establish these aggravating factors.

## THE MOTION FOR A NEW TRIAL

The standard to be followed by this court in deciding a motion for a new trial was set forth in *Aetna Casualty & Surety Co. v. Yeatts*, 122 F.2d 350, 352–53 (4th Cir.1941). Judge Parker wrote for the court:

> On such a motion it is the duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict. The exercise of this power is not in derogation of the right of trial by jury but is one of the historic safeguards of that right.

This language has been cited with approval repeatedly during the last forty-five years. *See, e.g., Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592 (4th Cir.1985); *Wyatt v. Interstate & Ocean Transp. Co.*, 623 F.2d 888 (4th Cir.1980); *Fischer v. United States*, 318 F.2d 417 (4th Cir.1963); *Williams v. Nichols*, 266 F.2d 389, 392 (4th Cir.1959); *see also* 11 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, §§ 2805 and 2819 (1973).

### I

■ The first ground of error asserted as the basis for a new trial involves the court's decision to admit evidence regarding Northwestern's net worth. Northwestern contends that the *Mattison* decision alters prior South Carolina law and requires the exclusion of the defendant's net worth as an offensive weapon of a plaintiff claiming punitive damages. This issue was timely raised by Northwestern in a pretrial motion *in limine*, which was denied. The court has carefully reviewed its earlier decision and finds no reason to disturb it.

Until recently, juries in South Carolina were given very little guidance in determining the amount of punitive damages to be awarded. Juries were generally instructed

that the punitive damage award should reflect:

1) the character of the wrong committed;

2) the punishment which should be meted out; and

3) the ability of the wrongdoer to pay.

*See, e.g. Patterson v. Bogan*, 261 S.C. 87, 198 S.E.2d 586, 590 (1973);[3] *see also* SOUTH CAROLINA BAR, CLE DIVISION, SOUTH CAROLINA RECOMMENDED CIVIL JURY CHARGES 1404 (1989). In *Gamble v. Stevenson*, 305 S.C. 104, 406 S.E.2d 350 (1991), the South Carolina Supreme Court established a post-trial review procedure to be utilized by South Carolina state trial judges when reviewing punitive damage awards. The *Gamble* decision was prompted by the decision of the United States Supreme Court in *Pacific Mutual Life Insurance Co. v. Haslip*, —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). *Haslip* upheld a constitutional challenge to an Alabama punitive damage award, relying strongly upon the post-trial review procedure mandated by Alabama law. In *Gamble*, the South Carolina Supreme Court adopted a similar post-trial review procedure for the South Carolina state courts. The factors to be addressed in a *Gamble* post-trial review are as follows:

1) defendant's degree of culpability;

2) duration of the conduct;

3) defendant's awareness or concealment;

4) the existence of similar past conduct;

5) likelihood the award will deter the defendant or others from like conduct;

6) whether the award is reasonably related to the harm likely to result from such conduct;

7) defendant's ability to pay; and finally,

8) as noted in *Haslip*, 'other factors' deemed appropriate.

*Gamble*, 406 S.E.2d at 354.

It was in this context that the United States Court of Appeals for the Fourth Circuit decided *Mattison*. In *Mattison*, Judge Niemeyer, writing for a unanimous

---

**3.** These three factors are derived generally from the RESTATEMENT (SECOND) OF TORTS § 908(2) (1977).

panel, held that the South Carolina law for awarding punitive damages, applied by the district court in a diversity case, denied the defendant due process in violation of the Fifth Amendment because of its lack of meaningful standards. The opinion proceeds to establish constitutionally required standards which must be incorporated in the federal trial court's jury instructions. The Fourth Circuit was unable to establish a post-trial review mechanism, as the South Carolina Supreme Court had done in *Gamble*, because a federal district court's review of a jury verdict is subject to Seventh Amendment constraints which are not imposed on any state-prescribed post-trial review. In setting out meaningful standards to be included in jury instructions, *Mattison* obviously borrows heavily from the *Gamble* standards. Indeed, *Mattison* explicitly states that the standards enunciated in that opinion are "derived from *Gamble*". 947 F.2d at 110.

Northwestern, however, asserts that the fourth factor to be included in jury instructions, as stated in *Mattison*, is a basis for refusing to allow a wealthy defendant's financial position to be put to the jury. The fourth factor reads as follows:

*Limitations based on ability to pay:* Any penalty must be limited to punishment and thus may not affect economic bankruptcy. To this end, the ability of the defendant to pay any punitive award entered should be considered.

*Id.* at 110.

Northwestern strenuously argues that the quoted language of *Mattison* alters prior South Carolina law to the extent that the defendant's ability to pay may henceforth be used only as a shield and not as a sword. The court respectfully disagrees. In *Mattison*, the record reflected that the defendant's actual net worth was $6,428.00. Thus, in the context of the case being decided, it was necessary to provide appropriate instruction to the trial judge on remand. In that case, the defendant's ability to pay would serve only as a limitation on the punitive award.

As noted above, prior to *Haslip*, *Gamble*, and *Mattison*, South Carolina law provided

for very little in the way of guidance for juries in determining punitive damages. One of the three specific factors that *was* well established, however, was the "ability of the wrongdoer to pay." *See supra*, at p. 403. Had the *Mattison* court wished to abrogate a long-standing South Carolina tort law principle on federal constitutional grounds, it seems likely that the Fourth Circuit would have expressly stated its intention. Moreover, as noted above, *Mattison* purports to simply adopt the *Gamble* post-verdict review standard and incorporate all of those requirements into the jury instructions in a federal diversity case. One factor set out by the court in *Gamble* is the defendant's "ability to pay." No limitation was made on the use of this factor by the court in *Gamble*.

In addition, other language in the *Mattison* decision seems to imply that the defendant's ability to pay is a factor that may be used in establishing an award. *See Mattison*, 947 F.2d at 105 ("... the net worth of the defendant, *while relevant*, is not a limiting factor [under present South Carolina standards]") [emphasis added].

For the foregoing reasons, the court finds no error in its decision to allow evidence regarding the net worth of Northwestern.

A separately stated, though interrelated, ground of error is the assertion that the court "erroneously failed to charge the fourth aspect" set forth in *Mattison* and "substituted its own version of South Carolina law" on that point. This alleged error is no more than a reassertion of the argument that the net worth of Northwestern should not have been admitted. The court has reviewed its jury charge regarding the fourth element of the *Mattison* decision and has determined that the jury charge follows the requirements of *Mattison*, with the exception that the jury was told that net worth may be considered both offensively and defensively. In accordance with *Mattison*, the jury was specifically advised that the amount of the punitive award should not "effect economic bankruptcy."

## II

■ The next ground of error asserted by Northwestern relates to certain paragraphs contained in contracts entered between Northwestern and its agents, which were introduced in an effort to demonstrate the control and supervision that Northwestern exercised over its agents including the agents who committed the fraudulent acts at issue here. The question of whether, and to what extent, the upper echelons of Northwestern participated in the wrongful conduct was the most hotly debated issue on retrial. To this end, the court allowed Northwestern, over Defender's objections, to introduce its contracts with its agents. At the first trial, Judge Henderson refused to allow these contracts into evidence and granted Defender's motion to strike all testimony relating to the issue. On retrial, Northwestern persuaded this court that the contracts did, in fact, demonstrate that Northwestern attempted to assert a degree of control and supervision over its agents. Accordingly, the contracts were allowed into evidence over the objection of Defender. The court did agree with Defender in two respects, however, and ordered that certain language in the contracts be redacted and not considered by the jury.

Specifically, the court ordered that paragraph four, defining the agent as an independent contractor, be deleted. That paragraph read as follows:

*Relationship*—Agent shall be an independent contractor and nothing herein shall be construed to make Agent an employee of the Company, General Agent or First Party. Agent shall be free to exercise his own judgment as to the persons from whom he will solicit Applications and the time, place and manner of solicitation, but the Company from time to time may adopt regulations respecting the conduct of the business covered hereby, not interfering with such freedom of action of Agent.

The court also redacted paragraph nine which purported to require the agents to indemnify the company. The specific language redacted reads as follows:

*Responsibility*—Agent shall be responsible to First Party and the Company for all business done by or entrusted to his agents or persons employed by him. He shall indemnify and save First Party, District Agent, General Agent and the Company harmless from any and all expenses, costs, causes of action and damages resulting from or growing out of acts or transactions by himself or his employees or agents.

The court excluded these two paragraphs from the jury's consideration relying upon Rule 403 of the Federal Rules of Evidence. That rule provides, in pertinent part, that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Fed.R.Evid. 403.

The earlier trial in this action resulted in a jury determination that Northwestern was liable for the actual and constructive fraud of its agents. Thus, to allow evidence regarding an alleged independent contractor relationship and an obligation by the agents to indemnify the insurance company would have only served to confuse the issues and possibly mislead the jury. In other words, an earlier jury has already determined that, for purposes of the acts complained of in this case, the acts of Northwestern's agents are to be imputed to the company. A contractual provision to the contrary would confuse the issues. Additionally, to the extent that a provision regarding indemnity by the agents for their fraudulent acts constitutes an effort to "control" the agents, the effort was minimal at best. Moreover, if the jury fully understood the import of the indemnification paragraph, the jury might then feel that it was called upon to make a determination of the punitive damages factors as applied to the *agents* and not to Northwestern. This would also confuse the issues. Accordingly, the court concludes that its earlier decision to redact these two paragraphs from the contracts, all of which were totally excluded by Judge Henderson, was not error.

## III

■ Northwestern next argues that evidence was improperly admitted regarding the financial condition of Kathryn Inabinet Vickery, a co-plaintiff in this action. Ms. Vickery was originally named as a party plaintiff in this case and was dismissed prior to the first trial. Before the case could be tried a second time, Northwestern moved to compel responses to certain discovery requests which sought to elicit the fact that Ms. Vickery, along with the Kathryn Inabinet Vickery Marital Trust, still retains a contractual right to a portion of the punitive damage award. Northwestern argued that if other parties besides Defender had an interest in the punitive award, then they needed to be added as co-plaintiffs. Defender initially objected to producing this information, and the court ordered that it be produced. Thereafter, prior to trial, Defender, having conceded that Ms. Vickery and the Marital Trust did retain a financial interest in the punitive award, moved that both be joined as party plaintiffs. Without objection from Northwestern, the court granted the motion.

On retrial, Northwestern attempted to, and did, put before the jury the proposition that Ms. Vickery was a wealthy woman. For example, while examining Kurt Cowan, a Northwestern employee, counsel for Northwestern elicited the fact that Ms. Vickery had a "sizeable estate." Record, Vol. I, at 192. The witness also made reference to Ms. Vickery's "personal worth." *Id.* The Northwestern witness was allowed to emphasize that her estate taxes alone were estimated to range between $5 million and $8 million.

Later in the trial, James R. Jones, a certified public accountant was called as a witness by Defender. Among other things, he was asked about the fact that Ms. Vickery's financial condition had worsened between the time that the life insurance policy was applied for and the date of the second trial. When Northwestern objected, the court responded that the door had been opened on this issue, during Cowan's testimony, and that testimony regarding Ms. Vickery's eroded personal financial condition would be admitted.

The court determined that admitting the testimony regarding Ms. Vickery's true financial picture was necessary to correct the false impression that had been created by Northwestern.

Additionally, when Northwestern's counsel cross-examined Mr. Jones, he again raised the subject of Ms. Vickery's worth by questioning Mr. Jones about what percent of her estate would represent estate taxes. Record, Vol. II, at 166. Plaintiffs' counsel objected to this line of questioning, and the court, consistent with its earlier ruling, allowed limited questioning of the witness regarding the fact that estate taxes upon an estate the size of Ms. Vickery's would be approximately fifty percent. Calculating from this figure, defense counsel elicited from Mr. Jones that Ms. Vickery's estate, at the time of the application for the policy, ranged between $10 million and $16 million.

In short, it was Northwestern, not Defender, who first injected the collateral matter of Ms. Vickery's personal worth into the case. Having done this, Northwestern cannot now be heard to complain that Ms. Vickery's financial position was improperly allowed into evidence.

Northwestern's efforts to portray Ms. Vickery as a wealthy woman, through the Cowan and Jones testimony, was not the first time during the trial that Northwestern sought to put before the jury the effect that a punitive award would have upon the recipient, nor was it the last. In opening statement, counsel for Northwestern told the jury "you have the power to make him [plaintiffs' counsel] rich. You have the power to make all these people who are going to testify on behalf of Defender rich." Record, Vol. I, at 33.

■ The court agrees with Northwestern's current position that the financial wealth, or lack thereof, of a punitive damage plaintiff is totally irrelevant to the jury's consideration. To this end, the court strictly admonished counsel prior to closing argument that it would not permit argument on this issue. Record, Vol. II, at 221–

22. Nevertheless, Northwestern's counsel, in closing argument, stated to the jury "It looked like she had an estate worth somewhere between 7, 15, $16 million." Record, Vol. IV, at 59.

In short, Northwestern has no standing to complain about the admission of Ms. Vickery's net worth because it was Northwestern who clearly opened the door through its opening statement and its own cross-examination of one of its own witnesses. It then continued to pursue this issue later in the trial in its cross-examination of Jim Jones and in its closing argument. Defender did not argue this issue to the jury, and the court's instructions on the law properly stated what was to be considered by the jury. In fact, the court told the jury that the plaintiffs had been paid their actual damages plus interest. The focus of the trial was squarely on the conduct of Northwestern and what it would take to punish Northwestern for fraud. Under these circumstances, the court perceives no error in the admission of testimony regarding Ms. Vickery's financial status; alternatively, the error, if there was one, was harmless.

## IV

■ Northwestern next argues that the court improperly precluded it from introducing evidence regarding the date on which the policy was delivered. The court's ruling in this regard was premised upon footnote one in Judge Henderson's order reducing the punitive award in the first trial. *Defender Industries*, 727 F.Supp. at 255 n. 1 ("The evidence indicates that Northwestern did not deliver a written policy to Defender until after Defender requested a reduction in coverage and rebate. The policy did not include a rebate term"). Northwestern did not take exception to this purported finding by Judge Henderson on appeal, and the finding was reiterated by the Fourth Circuit in its opinion:

> With this understanding, Defender purchased a policy for $8,000,000 of cover-

age. Northwestern maintained possession of the policy and did not deliver it to Defender until after the dispute precipitating this law suit arose.

938 F.2d at 504. Northwestern argues that footnote one in Judge Henderson's order was a gratuitous statement contained in a recitation of the facts viewed in the light most favorable to the non-moving party. The same argument is made with regard to the statement made in the Fourth Circuit opinion.

Although Northwestern strenuously argues that the delivery date has not been finally determined, its post-trial memorandum is noticeably bereft of any explanation of why the delivery date is relevant to the question of the amount of punitive damages to be awarded. Although Northwestern might be technically correct in that the delivery date has not been determined as a matter of law, any error in disallowing this testimony was unquestionably harmless. Defender's counsel made but a passing reference to the delivery date in closing argument. Record, Vol. IV, at 38.

## V

Northwestern next contends that the South Carolina law of punitive damages, as charged and applied in this case, violates its rights under the Due Process and Equal Protection Clauses of the United States Constitution.[4] Northwestern belatedly sought to raise these issues in the earlier appeal. *See Defender Industries*, 938 F.2d at 509 n. 3. After the case was remanded, Northwestern sought, and received, permission from this court to amend its answers so as to raise these additional constitutional challenges. Although the issues are now properly before the court, the court is of the opinion that any constitutional due process challenge to the South Carolina law of punitive damages has been answered by the Fourth Circuit in the *Mattison* decision and that the equal protection challenge is without merit.

---

4. The equal protection challenge was raised in *Mattison*, and the court refrained from addressing it. *See Mattison*, 947 F.2d at 101 n. 3.

408

■ As noted above, this court faithfully attempted to follow the requirements of *Mattison*, except for the issue of the defendant's net worth, which was not a factor in the *Mattison* case. Accordingly, the due process challenge is denied.

■ Northwestern also asserts that the South Carolina punitive damages scheme violates the equal protection clause of the Fourteenth Amendment because it allows juries to discriminate against the wealthy.[5] The United States Supreme Court, however, has clearly stated that courts are reluctant to overturn governmental action on the ground that it denies equal protection of the laws, unless it burdens a suspect classification or a fundamental interest. *Vance v. Bradley*, 440 U.S. 93, 96–97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979); *see also United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 174, 101 S.Ct. 453, 459, 66 L.Ed.2d 368 (1980). Thus, the court must first determine whether the South Carolina scheme of punitive damages "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution...." *San Antonio School Dist. v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973). If it does, then the court must apply a strict judicial scrutiny test, in which the state law would be upheld only if it is necessary to promote a compelling state interest. *See Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). If not, the state law is valid if it is "rationally related to furthering a legitimate state interest." *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976).

Northwestern contends that "classifications similar to the traditional idea of punitive damages, based solely upon wealth, have long been held suspect by the Supreme Court." Defendant's Brief at 10 (citing *San Antonio School Dist. v. Rodriguez*, 411 U.S. 1, 18–22, 93 S.Ct. 1278, 1289–91, 36 L.Ed.2d 16 (1973); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 668, 86 S.Ct. 1079, 1082, 16 L.Ed.2d 169 (1966); *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); *Engel v. O'Malley*, 219 U.S. 128, 31 S.Ct. 190, 55 L.Ed. 128 (1911)). Two of the cases cited by Northwestern, *Rodriguez* and *Engel*, however, expressly hold that at least some unequal treatment based upon wealth is constitutionally permissible. In *Engel* the Court upheld a banking regulation scheme that allegedly discriminated against less wealthy businesses. In *Rodriguez* the court examined the Texas scheme for funding public education, which allegedly benefitted the wealthy and burdened the poor. The Court upheld the Texas public school funding scheme stating that "a sufficient answer to appellees' argument is that, at least where wealth is involved, the Equal Protection Clause does not require absolute equality or precisely equal advantages." *Rodriguez*, 411 U.S. at 24, 93 S.Ct. at 1291.

Furthermore, neither *Harper* nor *Griffin* holds that wealth by itself is a basis for a suspect classification. Rather, they hold that the deprivation of fundamental rights based upon a person's indigence is unconstitutional. In *Harper*, the Court held that a poll tax was unconstitutional because it impinged upon the fundamental right to vote. "We have long been mindful that where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined." *Harper*, 383 U.S. at 670, 86 S.Ct. at 1083. In *Griffin*, the Court held that a state statute that

---

5. Although the court will undertake a traditional equal protection legal analysis in deciding the issue, it bears noting that Northwestern's fundamental premise (*i.e.*, that wealthy defendants are discriminated against because punitive awards are based on their ability to pay) may be flawed. If an impecunious defendant is called upon to pay punitive damages of $50 (10% of his net worth of $500) and a more well-to-do

defendant is called upon to pay punitive damages of $5,000 (10% of *his* net worth of $50,000), has there been unequal treatment of the more wealthy defendant merely because, in terms of raw dollars, the award against him was higher? Given the fact that the primary purpose of punitive damages is to punish the tortfeasor, there would appear to be no unequal treatment to the more wealthy defendant.

denied adequate appellate review to the poor although granting such review to all others was unconstitutional because it impinged upon the fundamental right to a fair trial. In this case, Northwestern has not asserted that the South Carolina punitive damages scheme impinges upon any fundamental right guaranteed by the Constitution.

Northwestern has cited no authority for its position that discrimination against the wealthy is constitutionally prohibited. To the contrary, the Supreme Court recognized that "this Court has never heretofore held that wealth discrimination alone provides an adequate basis for invoking strict scrutiny...." *Rodriguez*, 411 U.S. at 29, 93 S.Ct. at 1294. The cases cited by Northwestern, at best, hold that indigent people constitute a suspect class, which should be afforded constitutional protection. In *Rodriguez*, the Court distinguished the alleged discrimination in that case from cases in which the lack of personal resources has occasioned an absolute deprivation of a desired benefit. *Rodriguez*, 411 U.S. at 23, 93 S.Ct. at 1291. Thus, the Court has only afforded constitutional protection based upon wealth to indigents and only when the state law absolutely deprives the indigents of a significant, if not a fundamental, right.

Finally, in this case Northwestern complains generally that the South Carolina punitive damages scheme discriminates based upon wealth, but Northwestern has not even attempted to define the class to which it belongs or to show that such class is a suspect class. In *Rodriguez* the plaintiff argued that the class consisted of poor people in general in the state of Texas. The Court stated:

> However described, it is clear that appellees' suit asks this Court to extend its most exacting scrutiny to review a system that allegedly discriminates against a large, diverse, and amorphous class, unified only by the common factor of residence in districts that happen to have less taxable wealth than other districts. The system of alleged discrimination and the class it defines have none of the traditional indicia of suspectness: the class is not saddled with such disabilities,

or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.

*Id.* at 28, 93 S.Ct. at 1294.

This court, consistent with *Rodriguez*, finds that Northwestern is not a member of a suspect class and that wealth discrimination alone does not provide an adequate basis for invoking strict scrutiny.

Thus, to find that the South Carolina scheme of punitive damages violates Northwestern's equal protection right, the court must conclude that the punitive damages scheme is not rationally related to furthering any legitimate state interest.

In *Pacific Mutual Life Insurance Co. v. Haslip*, —— U.S. ——, ——, 111 S.Ct. 1032, 1041, 113 L.Ed.2d 1 (1991), the Court recognized that Alabama's common-law rule that a corporation is liable under respondeat superior for fraud committed by its agents had a rational relation to a legitimate state interest of deterring fraud. The Court recognized, "[i]mposing liability without independent fault deters fraud more than a less stringent rule. It therefore rationally advances the State's goal." *Id.* In this case, the South Carolina scheme of punitive damages, which allows a jury to punish wealthier defendants more to effect a proportionally equal deterrent, would also tend to deter fraud more than a less harsh rule. It therefore rationally advances South Carolina's goal of deterring fraud. Thus, the court finds that the South Carolina scheme of punitive damages is rationally related to a legitimate state interest.

The court, therefore, finds no merit to Northwestern's equal protection challenge to South Carolina's scheme of punitive damages.

## VI

■ Northwestern finally argues that the amount of the award is excessive under federal and state law. The amount of the award is asserted as a basis for a new trial outright. Although the court disagrees that the excessiveness of the award justi-

fies a complete new trial, the court will order a new trial *nisi* remittitur as noted below. Accordingly, the discussion of the excessiveness of the punitive award will be discussed in the following section.

## REMITTITUR

As noted above, Northwestern initially moved for a new trial and did not seek a remittitur order of this court. At oral argument on Northwestern's motion, the court ventilated this issue on its own, and invited the parties to submit memoranda directed to the question of whether the damage award should be remitted. These memoranda have been received and carefully reviewed by the court. Northwestern contends, as it did with the first verdict, that the punitive award is clearly excessive and as a result of passion, caprice or prejudice on the part of the jury. Northwestern asserts that to allow the $25 million punitive damage award to stand would result in a miscarriage of justice. For the reasons set forth below, the court agrees that the award is excessive and must be reduced.

The essential facts giving rise to Northwestern's liability for actual and constructive fraud have been thoroughly described in both Judge Henderson's reported decision and the United States Court of Appeals opinion reversing Judge Henderson. These essential facts will not be repeated in full here. With two exceptions, noted below, the testimony on retrial was in no material respect different from what has been reported in these earlier decisions. In short, Northwestern's agents sold Defender a policy with an explicit promise that the insurance policy on Kathryn Vickery's life would be reduced and a partial premium refund made, if Defender so requested, at a given point in the future. Northwestern thereafter refused to reform the policy as promised and refused to refund the premium. When Defender protested, a Northwestern agent made a direct threat that Northwestern could cause Defender to lose one of its largest customers in the event Defender canceled the policy.[6] Defender complained to the Chief Executive Officer

of Northwestern who, upon investigation, learned that the conduct about which Defender complained had, in fact, occurred. Nevertheless, the CEO wrote to Defender and indicated that the policy would not be reformed and that Northwestern saw no reason to discipline its agents. As noted by the Fourth Circuit, the evidence was susceptible to the inference that the upper echelon of Northwestern's management was aware of the misconduct and attempted to conceal it. On retrial, it was revealed that, in spite of the first award, Northwestern has still failed to discipline any of the agents involved.

Additionally, in the second trial, Northwestern sought to introduce new evidence regarding two mitigating factors. Specifically, Northwestern sought to put before the jury the proposition that the refund promise, if carried out, would have been illegal under South Carolina law. S.C. CODE ANN. § 38–55–50 (Law.Co-op.1989). Defender argued that to allow this testimony would be unfair, because at no time since the dispute erupted had Northwestern ever asserted illegality as a defense to the refund request. The court carefully examined the transcript of the earlier trial and concluded that illegality, *per se*, was not raised as an issue in that case. However, one of Northwestern's agents who testified in the first trial had made a passing reference to the fact that a partial refund would have amounted to "discrimination," a term used in the statute making refunds illegal. Northwestern was able to convince the court that this reference was a sufficient wedge to allow Northwestern to fully develop testimony in the second trial that Northwestern was prevented from making the refund payment because to do so would be "illegal" under South Carolina law.

A second area of new testimony centered on the civil and administrative penalties that Northwestern faces because of the conduct which has been brought to light by this litigation. Again, over Defender's strong objections, the court permitted the testimony. Northwestern successfully argued that because the intervening *Matti-*

---

6. This one customer generated revenues for De-    fender of $2 million to $3 million per year.

*son* decision had explicitly recognized that "other penalties for the conduct," including civil and administrative penalties, may be considered by juries in fashioning a punitive award, the issue should be fully developed on retrial.[7] Accordingly, Northwestern was allowed to introduce evidence to the effect that violation of the applicable South Carolina insurance laws may subject an insurance company to monetary fines and suspension or revocation of the privilege to sell insurance in South Carolina. *See generally* S.C.CODE ANN. § 38–2–10 (Law.Co-op.1989).

Although Defender initially opposed the injection of the illegality and civil penalty issues into the new trial, Defender attempted to make the most of the adverse rulings, and, in retrospect, appears to have been able to capitalize upon this new testimony to some extent. Although the new testimony regarding South Carolina's prohibition of insurance premium refunds allowed Northwestern to argue to the jury that its hands were tied by the law making such refunds illegal, Defender countered by arguing that Northwestern should be severely punished for allowing its agents to make a promise to do what they knew to be an illegal act. With regard to civil penalties, Defender was able to stand this issue on its head by suggesting that, although the South Carolina Insurance Commission had, and retains, the power to sanction Northwestern administratively, no such action has been taken by the insurance commission in the seven years since Northwestern's fraudulent conduct occurred. Thus, Defender was able to argue that punitive damages were necessary as a deterrent in this case because, quite obviously, the administrative sanctions had not been invoked and, in all likelihood will not be invoked in the future.

Finally, as was true at the first trial, the evidence disclosed that Northwestern is an exceedingly large and successful insurance company, having a net worth of over $35 billion and having gross income in South Carolina of approximately $20 million per year.

This brief review of the pertinent evidence [8] demonstrates quite forcefully that punitive damages were appropriate in this case. Defender has once again demonstrated multi-tiered wrongdoing on the part of Northwestern and its agents. This wrongdoing included fraudulent conduct, threats of reprisal, and concealment. Additionally, the evidence was susceptible to the inference that high ranking Northwestern officials participated in the fraud. Two South Carolina juries, totaling twenty South Carolina citizens, have both found that a substantial punitive award is appropriate in this case. On retrial, the court sided with Northwestern on the two most difficult evidentiary issues and allowed in new testimony regarding mitigating factors. Additionally, the court attempted to carefully follow the mandate of the *Mattison* decision and instruct the jury on the four aspects of the law of punitive damages recognized in that decision, which was clearly intended to be a moderating influence on punitive awards in South Carolina. In sum, the court is firmly convinced that a substantial punitive award against Northwestern is appropriate in this case.

Having determined that a substantial award is appropriate, however, the court is constrained to conclude that a punitive award of $25 million, even given the highly inappropriate conduct which occurred here, is excessive and must be reduced. As noted by Judge Henderson in her order reducing the first award, the harm Defender suffered did not involve personal injury or property damage. It involved a loss of just over $100,000 (and arguably only $13,000, the difference between the premiums for the initial coverage and the reduced coverage requested later) by a large company. There was no showing that the conduct which occurred here was part of a normal pattern or practice by Northwestern or

---

7. Actually, *Mattison's* articulation of this factor did not represent a recognition of an altogether new factor to be considered, as Northwestern suggests. In fact, Judge Henderson recognized this as a factor in her opinion reducing the first punitive award. *See* 727 F.Supp. at 260 n. 17.

8. This opinion recites the evidence in the light most favorable to Defender.

that this activity is likely to be repeated in the future.

■ Defender argues, quite correctly, that South Carolina decisions have repeatedly held that there is no mathematical formula to be applied in determining a punitive damage award. *Hicks v. Herring*, 246 S.C. 429, 144 S.E.2d 151, 154 (1965). In other words, there is no appropriate ratio between actual damages and punitive damages. *Rogers v. Florence Printing Co.*, 233 S.C. 567, 106 S.E.2d 258, 262 (1958).

Although there is no mathematical formula by which a punitive award can be compared to an actual damage award, the punitive award must not be "grossly disproportionate" to the severity of the offense. This proposition was recognized by the South Carolina Supreme Court in *Gamble.* 406 S.E.2d at 354 ("upon completing its review, *dedicated to the postulate that no award be grossly disproportionate to the severity of the offense,* the trial court shall set forth its findings on the record.") [emphasis added]. The *Mattison* court quoted this language verbatim and then said:

> Providing standards to follow in the course of the review, the court not only permits consideration of the *Haslip* factors, but directs that *no punitive damages award shall be 'grossly disproportionate' to the severity of the conduct.*

*Mattison,* 947 F.2d at 106 [emphasis added].

Application of the foregoing principle to the punitive award here leads to the inescapable conclusion that the award is grossly disproportionate to the severity of the conduct which occurred here.

Defender vigorously argues that a punitive award of $25 million is necessary to appropriately "punish" a wealthy defendant such as Northwestern. It points to the fact that Northwestern has a net worth in excess of $35 billion, that it earns over $6.9 million per day in interest on its investments, and that if the South Carolina Insurance Commission had revoked its license to write insurance in South Carolina for only one year, Northwestern would have suffered a loss of gross premiums of over $20 million.

This case dramatically demonstrates the inherent tension that exists among the various factors to be addressed in assessing punitive damages. In this case, if one looks solely at the ability of the wrongdoer to pay, a $25 million punitive award might be justified. However, the ability of a financially sound defendant to pay a punitive award is but one of many factors which must be considered. This court must be mindful of *Mattison's* admonition that "any penalty imposed should bear a relationship to the nature and extent of the conduct and the harm caused, including the compensatory damage award made by the jury." 947 F.2d at 110. Accordingly, the court concludes that a substantial reduction in the punitive award is appropriate in this case.

There are three general approaches that have been recognized for determining the appropriate amount of a remittitur:

1) The excessive verdict may be reduced to the minimum amount that the jury could have awarded.

2) The excessive verdict may be reduced to the maximum amount that the jury could have awarded.

3) The excessive verdict may be reduced to whatever amount the reviewing court thinks the jury should have awarded.

*K–B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148 (10th Cir.1985); *see also* 11 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2815, at 104–05 (1973). Professors Wright and Miller clearly favor the second of these approaches as the only one passing constitutional muster under the Seventh Amendment. *Id.* A remittitur order reducing a jury's award to the outer limit of the proof has been recognized as the appropriate remedy by numerous courts considering the three recognized approaches. *See, e.g. K–B Trucking Co.*, 763 F.2d at 1163; *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1448 (11th Cir.) *cert. denied* 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985); *Dixon v. International Harvester Co.*, 754

F.2d 573, 590 (5th Cir.1985); *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir.1983); *Glazer v. Glazer*, 278 F.Supp. 476, 482 (D.La.1968). This approach is also the preferred view of other commentators. *E.g.*, FLEMING JAMES, JR., CIVIL PROCEDURE § 7.21, at 326 (1965); 6A JAMES W. MOORE & JO DESHA LUCAS, MOORE'S FEDERAL PRACTICE ¶ 59.08[7], at 59–193 to 195 (1989). Agreeing with these authorities, the court adopts the view that any reduction in the award of the verdict here should be to the *maximum* that this court finds a reasonable jury could award in light of the evidence in this case.

After carefully reviewing and reflecting upon all of the testimony that occurred in the second trial, the court has concluded that the punitive award should be reduced to $5 million. Giving due consideration to the relationship to the harm caused, other penalties for the conduct which occurred, improper profits and the plaintiffs' costs, and the ability of the defendant to pay, the court finds and concludes that $5 million is the most that a reasonable jury could award by way of punitive damages in this case.

Lest the court be accused of second guessing Judge Henderson's determination that $10,000 was appropriate, it should be noted that *two* South Carolina juries, independently reviewing the evidence, have now concluded that a substantial award should be made in this case, thus indicating that the first jury verdict was not an aberration. Additionally, Northwestern prevailed on nearly every legal issue in dispute at the second trial. That is to say, the court required Defender to reprove much of its case, despite Defender's arguments that certain issues were res judicata;[9] the court allowed into evidence documentary evidence introduced by Northwestern that Judge Henderson had excluded;[10] the court allowed Northwestern to offer evidence in mitigation that was not introduced at the first trial;[11] and the court charged the jury in accordance with *Mattison*. Moreover, the testimony in the second trial was, in three specific respects, more damaging to Northwestern. First, Northwestern had not taken steps to fire or otherwise discipline its employees who were involved in the fraudulent conduct, despite the fact that the 1985 conduct had been unanimously found to be fraudulent by a jury, a judge of this court, and an en banc panel of the United States Court of Appeals for the Fourth Circuit. Second, the promises made were illegal under South Carolina law, a fact not made known to the first jury and not argued to Judge Henderson. Finally, although the South Carolina Insurance Commission has sweeping powers to administratively discipline Northwestern for what occurred, it has not done so and quite obviously does not intend to do so in light of the fact that seven years have elapsed since the conduct occurred. For all of these reasons, the court finds that the maximum figure that a reasonable jury could have returned is $5 million.

For the foregoing reasons, it is ordered that the defendant's motion for a new trial on the grounds discussed in parts I through VI of this order be, and the same hereby is, denied.

It is further ordered that the plaintiffs, Defender Industries, Inc., Kathryn Inabinet Vickery, and the Kathryn Inabinet Vickery Marital Trust remit all in excess of $5 million punitive damages within ten (10) days upon condition that a new trial be granted as to punitive damages only if they fail to do so.[12]

IT IS SO ORDERED.

---

9. *See supra* note 2.

10. *See supra*, at p. 405.

11. *See supra*, at p. 402.

12. Northwestern has moved to certify the legal issues addressed herein for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The motion is denied, for now, without prejudice. Northwestern may renew the motion if Defender declines to accept the remittitur and opts for a new trial.