34 F.3d 1066
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
James A. HENSON, Plaintiff-Appellee,
v.
GTE PRODUCTS CORPORATION, Defendant-Appellant.
 No. 93-1862.
 United States Court of Appeals, Fourth Circuit.
 Argued February 9, 1994.
Decided September 1, 1994.
 
 Appeal from the United States District Court for the District of South Carolina, at Columbia. Matthew J. Perry, Jr., District Judge. (CA-91-2194-3-0).
 Argued: Jeffrey Alan Jacobs, Nelson, Mullins, Riley & Scarborough, Columbia, SC. On brief: Thornwell F. Sowell, Nelson, Mullins, Riley & Scarborough, Columbia, SC, for Appellant.
 Argued: James B. Richardson, Jr., Svalina, Richardson & Smith, Columbia, SC. On brief: Gerald F. Smith, Svalina, Richardson & Smith, Columbia, SC, for Appellee.
 D.S.C.
 AFFIRMED AND REMANDED.
 Before NIEMEYER, Circuit Judge, BUTZNER, Senior Circuit Judge, and ELLIS, United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 BUTZNER, Senior Circuit Judge:
 
 
 1
 The principal issue in this appeal is whether the Contract Clause bars enforcement of a South Carolina statute that authorizes an award of punitive damages and attorney fees against a manufacturer who fails to pay amounts due to a sales representative after termination of the parties' contract. The district court found no bar and entered judgment on the verdict of a jury awarding damages to James A. Henson, a former sales representative of Sylvania Lighting. The appellant assigns error to the judgment and to a number of rulings the district court made. Finding no cause for reversal, we affirm.
 
 
 2
 * Sylvania Lighting was a division of GTE Products Corporation. Pending this litigation, GTE sold the division to OSRAM GmbH, which is a subsidiary of Siemens GmbH. The district court and the parties have referred to the defendant as Sylvania, and we will do the same. Expressing dissatisfaction with Sylvania, Henson resigned in 1990 and brought suit for unpaid commissions, punitive damages, and attorney fees. Sylvania filed a counterclaim alleging that Henson had breached the contract.
 
 
 3
 The contract provided that it should be construed and enforced according to Massachusetts law. Sylvania asserts that it is not liable for punitive damages and attorney fees because Massachusetts does not allow these damages and fees in contract cases.
 
 
 4
 Henson, however, relies on Chapter 65 of the South Carolina Code Secs. 39-65-10 to 39-65-70 concerning payment of post-termination claims to sales representatives. If payment is not made, S.C.Code Sec. 39-65-30 provides that a sales representative is entitled to punitive damages and attorney fees. Section 39-65-70 provides: "A provision in any contract between a sales representative and a principal purporting to waive any provision of this chapter, whether by expressed waiver or by a contract subject to the laws of another state, is void." Section 39-65-70, Henson says, requires the court to apply South Carolina law, not Massachusetts law, to determine the availability of punitive damages and attorney fees.
 
 
 5
 Sylvania counters by asserting that the Contract Clause of the United States Constitution renders Chapter 65 unconstitutional because South Carolina enacted it after the date of the contract that was in effect at the time Henson terminated his representation.
 
 
 6
 In opposition to Sylvania's constitutional defense, Henson asserts that the terms of the parties' written contract was in effect only because the parties agreed to abide by these terms after Secs. 39-65-30 and 39-65-70 were enacted. He also claims that the statutes are an exercise of the state's police power and that for that reason they are not subject to the Contract Clause.
 
 
 7
 The district court upheld Henson's contentions on both issues.
 
 II
 
 8
 Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346-47 (1936) (Brandeis, J., concurring), reiterates that courts must not unnecessarily decide constitutional questions. If a case can be decided by the application of general law, a court should forego deciding it on constitutional grounds. Adhering to this precept, we will first consider Henson's claim that the Contract Clause does not apply. If this be so, we need not address the question of whether the Contract Clause renders Chapter 65 unconstitutional with respect to the parties' contract.
 
 
 9
 South Carolina courts generally give effect to contractual choice of law clauses. See, e.g., Firestone Financial Corp. v. Owens, 419 S.E.2d 830, 831-32 (S.C. Ct.App.1992). Nevertheless, "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." Restatement (Second) of Conflict of Laws Sec. 6(1) (1971). Unless the Contract Clause renders the South Carolina statutes unconstitutional, we have no doubt that a South Carolina court would follow the statutory directive of Sec. 39-65-70. It would hold that the provision in Henson's contract with Sylvania concerning the application of the law of Massachusetts is void insofar as it would render unavailable punitive damages and attorney fees.
 
 
 10
 In diversity cases a federal court must give effect to the conflict of law rules prevailing in the state where it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941). Consequently, the district court was obliged to follow the choice 'of law provision in Sec. 39-65-70 and apply South Carolina law to the issue of punitive damages and attorney fees as provided by Sec. 39-65-30, unless the Contract Clause intervened.
 
 
 11
 The Contract Clause provides: "No State shall ... pass ... any Law impairing the Obligation of Contracts." U.S. Const. Art. 1, Sec. 10. The clause prohibits states from impairing only existing contracts. In Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 242 (1978), the Court examined the limits the clause imposes on "the power of a State to abridge existing contractual relationships." (emphasis added). Recently we addressed the question of the Clause's application to a statute that affected "agency contracts entered into before [the statute's] enactment." See Garris v. Hanover Ins. Co., 630 F.2d 1001, 1003 (4th Cir.1980). In short, a law operating prospectively on a contract is not an impairment within the meaning of the Contract Clause. See J.E. Nowak and R.D. Rotunda, Constitutional Law, Sec. 11.8 at 405 (4th ed.1991).
 
 
 12
 The chronology of events becomes important. The parties entered into a contract July 1, 1987. The effective date of Secs. 39-65-30 and 39-65-70 was May 2, 1988. By its terms the contract expired July 1, 1989, and it contained no provision for automatic renewal. At that time Sylvania could have terminated its dealings with Henson. The parties, nevertheless, agreed in 1989 to continue their relationship under the terms of the expired contract. Henson terminated the relationship on February 1, 1990.
 
 
 13
 Henson describes the agreement to abide by the terms of the 1987 contract after its expiration as a novation. But whether it was technically a novation, it certainly was a new contract to proceed on the terms of the expired contract. In Trustees of Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518 (1819), Justice Washington defined "contract" within the meaning of the Contract Clause: "What is a contract? It may be defined to be a transaction between two or more persons, in which each party comes under an obligation to the other, and each reciprocally acquires a right to whatever is promised by the other." 17 U.S. at 656. Justice Washington went on to say that this definition included an agreement because "there is a mutual consent of the minds of the parties ... respecting some property or right." 17 U.S. at 656.
 
 
 14
 Undoubtedly the agreement the parties made in 1989 after the expiration of the 1987 contract was a new contract within the meaning of the Contract Clause. Because Secs. 39-65-30 and 39-65-70 became effective in 1988, they did not impair the parties 1989 contract. The district court properly applied South Carolina law--not Massachusetts law--pertaining to punitive damages and attorney fees.
 
 III
 
 15
 Sylvania also assigns the following errors: the verdict was not supported by the evidence; the contract and Henson's testimony precluded his recovery of commissions; Henson breached the contract; the evidence was insufficient to support the submission of the issue of punitive damages to the jury; and the district court improperly entered judgment as a matter of law against Sylvania on its counterclaim. Sylvania raised these issues by appropriate trial and posttrial motions.
 
 
 16
 We review denial of motions for judgment as a matter of law de novo, viewing the evidence in the light most favorable to Henson, the nonmoving party, and giving him the benefit of all reasonable inferences. In doing so, we cannot assess the credibility of witnesses or weigh the evidence. See Herold v. Hajoca Corp., 864 F.2d 317, 319 (4th Cir.1988). We also review the construction of a contract de novo. See Scarborough v. Ridgeway, 726 F.2d 132, 135 (4th Cir.1984). Sylvania protests that the district court erred by "charging the law of waiver to the jury." We will review de novo whether the district court properly perceived waiver to be an issue in the case.
 
 
 17
 Henson had represented Sylvania in South Carolina since 1969 as an independent contractor paid by commissions. He was Sylvania's exclusive agent in the state. In the late 1970s, Amida Industries began manufacturing mobile lighting equipment for use at construction projects. The company was well experienced in mechanics, but none of its employees had much knowledge about lighting fixtures. Henson offered expert advice and supplied Amida a 19" Sylvania reflector that fit its needs. The company prospered and became one of Sylvania's largest customers. No other lighting manufacturer made 19"' reflectors, and using another size would have required Amida to make costly changes in its product. So successful was Henson that one of Sylvania's officers ventured the opinion that it would have taken an act of God to force Amida to buy its reflectors from anyone else provided the price was right.
 
 
 18
 Henson and Amida agreed to use a blanket purchase order with a price fixed annually and an estimate of the number of lighting fixtures that Amida would need. From time to time Amida called for release of the fixtures in lots of approximately 300. The blanket purchase order afforded Amida price protection for a year and gave Sylvania a realistic estimate of the number of fixtures Amida would buy. In 1989, Henson and Amida agreed on a price of $102 per fixture, which was acceptable to Sylvania. Henson's contract did not set forth his commission. He and Sylvania negotiated commissions on the Amida sales. For 1989, it was 8%.
 
 
 19
 Henson's contract provided that he would not handle competing or similar products. Nevertheless, in common with other factory representatives and the usage of the trade, Henson represented a number of other lighting representatives with Sylvania's knowledge and acquiescence. Factory representatives were free to take an additional line without notifying Sylvania until it made inquiry. About once a year Sylvania requested its representatives to furnish the names of other manufacturers they represented. As long as the representatives were producing satisfactorily Sylvania had no objection. In 1989, Henson added Hubbell to the ten other lighting manufacturers he was representing. Hubbell was a competitor of Sylvania. Upon inquiry Henson told Sylvania that he had taken on the Hubbell line and that he would do nothing to jeopardize Sylvania's sales to Amida. Despite the fact that Hubbell was a competitor, Sylvania decided to keep Henson indefinitely because they could not replace him. It made no protest about his representation of Hubbell, and Henson heard nothing more from Sylvania about Hubbell.
 
 
 20
 In December 1989, Henson and Amida began negotiations for the 1990 blanket purchase order. Amida stated that it was cutting costs in every aspect of its business. Henson passed this information to Sylvania and suggested that $96 would be a fair price. Sylvania, however, did not accept Henson's suggestion. Instead Sylvania's national and regional sales managers purposely excluded Henson from their meeting with Amida. Without consulting Henson, the Sylvania sales managers agreed to a price of $91 for a blanket order of 4,800 units. Amida sent a copy of the purchase order to Henson, and he sent it to Sylvania. Without the usual negotiations, Sylvania unilaterally fixed Henson's commission at 3%. Henson responded by requesting his Amida commission of 8%. He received no reply.
 
 
 21
 The evidence disclosed that Henson never endeavored to have Amida buy Hubbell's reflector. He always recommended Sylvania's reflector. Quite apart from the reflector unit, Henson tried to sell Amida a Sylvania quartz light. Amida would not buy the light because the design was not suitable. Henson then showed the Hubbell quartz light which Amida bought through a Hubbell distributor. Henson, like other Hubbell representatives, was not authorized to sell directly to customers. This transaction was relatively small, and Sylvania does not claim any damage because of it. Moreover, Sylvania introduced no evidence that it manufactured a quartz light similar to Hubbell's that would have met Amida's needs.
 
 
 22
 Disappointed by his exclusion from an important meeting with his best customer, Henson resigned, claiming, however, that he was due his commissions on all orders entered before his resignation. This included the Amida order. Sylvania paid Henson 3% commissions for 90 days, stating that this was their custom. Sylvania's regional sales manager then resigned, and Sylvania appointed him its exclusive representative in South Carolina as a replacement for Henson. Sylvania paid him the balance of the 3% commissions on the sale of 4,800 units. Henson then brought this action in state court. Sylvania removed it and filed a counterclaim. The jury awarded Henson compensatory damages in the amount of $26,184.48, based on a commission of 6% of the purchase price for 4,800 units less amounts already paid to him, and punitive damages of $26,184.48 as authorized by Sec. 39-65-30. The district court entered judgment as a matter of law against Sylvania on its counterclaim. The district court awarded Henson attorney fees and retained jurisdiction for consideration of additional fees.
 
 IV
 
 23
 Ruling that the contract was ambiguous, the district court submitted its construction to the jury under proper instructions. The pertinent provisions of the contract are as follows:
 
 
 24
 6.1 The Representative shall be entitled to a commission on all purchase orders or contracts that accrue to the benefit of the Representative in accordance with the terms of this Agreement, that are accepted by GTE and that are dated prior to the effective date of termination of this Agreement.
 
 
 25
 * * *
 
 
 26
 6.2 (c) Commissions shall be paid to the Representative only on the "Net Sales Price" (hereafter defined) of orders for Products booked by the Representative and only after those orders have been invoiced by GTE to the customer.
 
 
 27
 * * *
 
 
 28
 6.7 No commission will be paid to Representative for:
 
 
 29
 (a) orders placed for Representative's own account
 
 
 30
 (b) orders for repairs
 
 
 31
 (c) orders received without effective assistance of Representative for Products which will be exported overseas by an exporter in the Territory....
 
 
 32
 (d) orders received from any of the Appendix C excluded amounts.
 
 
 33
 Henson relies on paragraphs 6.1 and 6.7; Sylvania relies on p 6.2(c). Testimony about the commissions included Henson's admission that he was not a party to the negotiations that resulted in the $91 price, and so he did not "book" the Amida blanket order. He testified that nevertheless he was entitled to the commissions on the order. For its part, Sylvania's regional sales manager testified that Henson's exclusion from the meeting when the 1990 price was negotiated would not affect his commission and that Henson would still be entitled to his commission.
 
 
 34
 During 1990, personnel at Sylvania created confusion about shipping under the blanket order. To correct this situation Amida and Sylvania canceled the remainder of the blanket order and replaced it with separate purchase orders for each shipment. The price, terms, and conditions remained the same. Sylvania contends that Henson was not entitled to commissions on the new orders. Henson claims that the separate purchase orders were a mere substitute for the blanket order and that the change did not affect his commissions.
 
 
 35
 As the district court ruled in its posttrial opinion, the jury's construction of the contract was proper in light of all the circumstances. Paragraph 6.1 entitled Henson to the commissions on the blanket order because he was the exclusive sales representative in the state and the order was accepted by Sylvania prior to the termination of the parties' relationship. Paragraph 6.2(c) fixed the amount and time of payment of commissions. Paragraph 6.7 described the circumstances that bar a sales representative from receiving commissions. None of these disqualifying circumstances was applicable to Henson. If a sales representative's resignation denied or curtailed his commissions, it is reasonable to infer that such a provision would have been listed in Paragraph 6.7. The evidence also supports the finding, which is implicit in the verdict, that converting the blanket order into separate orders with the same price, terms, and conditions did not affect Henson's commission.
 
 
 36
 The evidence discloses that Sylvania waived the contract's prohibition against Henson's representation of Hubbell. After Henson told Sylvania that he represented Hubbell, Sylvania, knowing that Hubbell was a competitor, nevertheless retained him as its sales agent. It would be error to deny Henson commissions as a matter of law under such circumstances. The district court properly submitted to the jury the issue whether Sylvania waived its contractual prohibition.
 
 
 37
 The district court declined to charge the jury on the standards for the determination of punitive damages in tort cases as Sylvania urged. Instead, applying Sec. 39-65-30 and borrowing from the law pertaining to insurance contracts, it decided that the appropriate standard for statutory punitive damages in a contractual setting was bad faith on the part of the defendant. See Crossley v. State Farm Mut. Auto. Ins. Co., 305 S.C. 354, 359-60, 415 S.E.2d 393, 396-97 (1992). It is undisputed that Sylvania's decision not to pay the commissions was willful. It was not accidental or inadvertent. In its opinion the district court identified examples of Sylvania's bad faith that supported the jury's award of punitive damages. Sylvania wrote Henson that it would pay commissions for 90 days after his termination in accordance with the company's usual practice. The regional sales manager, however, conceded that he knew of no such practice. The jury could reasonably have inferred that Sylvania misrepresented its reason for ending commission payments in order to deter Henson from bringing suit by misleading him to believe he was being treated like other agents. Sylvania also stopped payment on Henson's last commission check without explanation. The district court instructed the jury to consider the factors prescribed in Mattison v. Dallas Carrier Corp., 947 F.2d 95, 106 (4th Cir.1991). See also Gamble v. Stevenson, 305 S.C. 104, 109-12, 406 S.E.2d 350, 353-55 (1991).
 
 
 38
 We conclude that the evidence supports the statutory punitive damage award and that the award complies with the principles explained in Mattison.
 
 
 39
 Sylvania calculated its counterclaim damages on the difference between the $96 that Henson had said was a fair price for the 4,800 units in the blanket order and the $91 price for which its sales managers sold the units to Amida. The district court ruled that this evidence was too speculative to support a verdict, and at the conclusion of all the evidence it granted Henson's motion for judgment as a matter of law on the counterclaim.
 
 
 40
 We agree with the district court that the damages were too speculative. Sylvania introduced no evidence that Amida would have closed a deal at $96 except for Henson's assertion that this price was fair. Amida's purchasing agent testified, but he gave no indication that he would have paid $96. Furthermore, Sylvania's national and regional sales managers were unable to obtain a price better than $91 after arms-length negotiations with Amida. They offered no proof that Henson could have done better had they not interfered by excluding him from the negotiations.
 
 
 41
 The judgment of the district court is affirmed, and the case is remanded to reflect the change in the ownership of Sylvania and for the district court's consideration pursuant to Sec. 39-65-30 of attorney fees incident to this appeal.
 
 AFFIRMED AND REMANDED